[This decision has been published in *Ohio Official Reports* at 91 Ohio St.3d 117.]

TRUE CHRISTIANITY EVANGELISM, APPELLANT, *v*. ZAINO, TAX COMMR., APPELLEE.

[Cite as *True Christianity Evangelism v. Zaino*, 2001-Ohio-295.]

*Taxation—Real property—Exemptions—Relevant factor for determining exemption under R.C. 5709.12 of two-story house owned by an Ohio nonprofit corporation is whether the institution is using the property exclusively for charitable purposes—Decision of Board of Tax Appeals denying exemption reversed.*

(No. 00-292—Submitted January 10, 2001—Decided March 7, 2001.)

APPEAL from the Board of Tax Appeals, No. 96-K-904.

_____

*Per Curiam.*

{¶ 1} Appellant seeks exemption for a two-story house in Akron. Over a year ago in *True Christianity Evangelism v. Tracy* (1999), 87 Ohio St.3d 48, 716 N.E.2d 1154, we remanded this matter to the Board of Tax Appeals ("BTA") to determine whether appellant used the property exclusively for charitable purposes.

{¶ 2} The BTA found that the property is neither open to the public nor used in public worship. No one resides in the house. Jeffrey A. Botzko, appellant's president, is the only person using the property. After remand, the BTA denied the exemption because the property was not being used exclusively for charitable purposes. This cause is now before this court upon an appeal as of right.

{¶ 3} Appellant seeks exemption under R.C. 5709.12, which states that "[r]eal * * * property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation."

{¶ 4} We are to strictly construe statutes granting exemption, and the burden rests on the one claiming an exemption to demonstrate that the property

qualifies. *OCLC Online Computer Library Ctr., Inc. v. Kinney* (1984), 11 Ohio St.3d 198, 11 OBR 509, 464 N.E.2d 572.

{¶ 5} To be exempted from taxation under R.C. 5709.12, the property must (1) belong to an institution and (2) be used exclusively for charitable purposes. *Highland Park Owners, Inc. v. Tracy* (1994), 71 Ohio St.3d 405, 406, 644 N.E.2d 284, 286. The BTA found that appellant was an institution, and that finding has not been challenged; thus, the property belonged to an institution.

{¶ 6} The BTA next found that the primary use of the property was "an evangelistic one." On the basis of this finding, the BTA stated that "a distinction may be drawn between charitable and religious institutions and the activities in which they engage." The BTA cited for support *Summit United Methodist Church v. Kinney* (1982), 2 Ohio St.3d 72, 2 OBR 628, 442 N.E.2d 1298; *Summit United Methodist Church v. Kinney* (1983), 7 Ohio St.3d 13, 7 OBR 406, 455 N.E.2d 669; and *Operation Evangelize-Youth Mission, Inc. v. Kinney* (1982), 69 Ohio St.2d 346, 23 O.O.3d 315, 432 N.E.2d 200. We decline to follow these cases because they limited the application of R.C. 5709.12 to the entities described in R.C. 5709.121. The application of R.C. 5709.121 is limited by its terms to "[r]eal property and tangible personal property belonging to a charitable or educational institution or to the state or a political subdivision." R.C. 5709.121 does not limit the application of R.C. 5709.12 to other entities. This case applies only R.C. 5709.12.

{¶ 7} In *Episcopal Parish v. Kinney* (1979), 58 Ohio St.2d 199, 201, 12 O.O.3d 197, 198, 389 N.E.2d 847, 848, we adopted Justice Stern's concurring opinion in *White Cross Hosp. Assn. v. Bd. of Tax Appeals* (1974), 38 Ohio St.2d 199, 203, 67 O.O.2d 224, 226, 311 N.E.2d 862, 864, wherein he stated that as regards R.C. 5709.12, "*any* institution, irrespective of its charitable or noncharitable character, may take advantage of a tax exemption if it is making exclusive charitable use of its property." (Emphasis *sic.*) Thus, R.C. 5790.12 is applicable to "any institution"; religious institutions are not excluded from the

application of R.C. 5709.12. Conversely, the application of R.C. 5709.121 is limited to charitable or educational institutions or to the state or a political subdivision.

{¶ 8} Thus, for purposes of exemption under R.C. 5709.12 whether the institution is religious or charitable is not a relevant factor. The relevant factor for determining exemption under R.C. 5709.12 is whether the institution is using the property exclusively for charitable purposes. In *Am. Commt. of Rabbinical College of Telshe, Inc. v. Bd. of Tax Appeals* (1951), 156 Ohio St. 376, 46 O.O. 217, 102 N.E.2d 589, paragraph one of the syllabus, we held, "If operated without any view to profit, an institution used exclusively for the lawful advancement of education and of religion is an institution used exclusively for charitable purposes, within the meaning of Section 2 of Article XII of the Constitution and of Section 5353, General Code [now R.C. 5709.12]." See, also, opinion of Justice Taft concurring in judgment in *Cleveland Bible College v. Bd. of Tax Appeals* (1949), 151 Ohio St. 258, 261, 39 O.O. 70, 71, 85 N.E.2d 284, 285.

{¶ 9} The BTA found that the primary use of the property was (1) "an evangelistic one" and (2) for "the preparation and dissemination of a religious message." At another point the BTA stated that the property was "used by Botzko in the preparation and deliverance of his evangelic message."

{¶ 10} The term "evangelistic" is defined in Webster's Third New International Dictionary (1986) 786 as "**1:** of or relating to evangelism." "Evangelism" is defined as "**1:** the proclamation of the gospel; * * * the presentation of the gospel to individuals and groups by such methods as preaching, teaching, and personal or family visitation programs **2:** missionary, militant, or crusading zeal for or earnest advocacy of any cause." *Id.* In describing his activities, Botzko stated:

"My goal is to inspire, enthuse, or to badger people into actually reading the Bible and finding out what it says and living up to its standards. Or even apart from

that, just encourage them to seek the highest moral standards they can from whatever source they will accept. Like I tried to encourage people who believe in the Koran to find the best moral standards in it and see if there is higher things in the Bible that you can go above what the Koran says.

"I try to promote true Christianity, but if I can't do that, I still try to promote the best moral standards part."

{¶ 11} In another part of his testimony, Botzko described his activities as "distribution of the literature, influencing everyone I can, in any way, to live up to the better moral standards of the Bible, you know, thus not be a burden on society instead of acting contrary to the good moral standards which puts a burden on society; supporting them in prison, assuming their children, you know, and everything that goes into all the police work and social services that result from the fact that people are not living up to the best moral standards they could." In *Murdock v. Pennsylvania* (1943), 319 U.S. 105, 108, 63 S.Ct. 870, 872, 87 L.Ed. 1292, 1296, the court stated that "[t]he hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses."

{¶ 12} The question for consideration thus becomes whether the evangelistic activities of appellant constitute charitable purposes. The General Assembly has not defined what activities of an institution subject to R.C. 5709.12 and not R.C. 5709.121 constitute charitable purposes. However, in past cases we have held that "[i]n the absence of a legislative definition, 'charity,' in the legal sense, is the attempt in good faith, *spiritually*, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity." (Emphasis added.) *Planned Parenthood Assn. of Columbus, Inc. v. Tax Commr.* (1966), 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the

syllabus. It is against this definition that appellant's activities must be measured to determine if they constitute a charitable purpose.

**{¶ 13}** In *Herb Soc. of Am., Inc. v. Tracy* (1994), 71 Ohio St.3d 374, 376, 643 N.E.2d 1132, 1134, we stated, "The dissemination of useful information to benefit mankind is, traditionally, charity." In *Battelle Mem. Inst. v. Dunn* (1947), 148 Ohio St. 53, 60, 35 O.O. 9, 12, 73 N.E.2d 88, 92, we stated that "[g]enerally, the dissemination of knowledge for the edification and improvement of mankind is regarded as a charitable object." Likewise, in *Am. Issue Publishing Co. v. Evatt* (1940), 137 Ohio St. 264, 266, 18 O.O. 27, 28, 28 N.E.2d 613, 614, we held, " 'Charity' has been broadly defined as that which benefits mankind and betters its condition. Hence it has often been held by the courts that organizations engaged in discouraging the consumption of intoxicants are promoting individual and social welfare and come within the definition of a charity." In *Am. Humanist Assn., Inc. v. Bd. of Tax Appeals* (1963), 174 Ohio St. 545, 23 O.O.2d 210, 190 N.E.2d 685, we reversed a decision of the BTA that had denied exemption under R.C. 5709.12 to a not-for-profit corporation whose purposes were "to study and extend educational principles and ideals concerning human progress, values and welfare, and, in connection therewith, to publish magazines, books, pamphlets and other forms of literature, and to engage lecturers in order that the purposes of the association may be accomplished." The association's properties were used for offices, conference and storage rooms, and an area where multilithing, addressing, and mailing were done.

**{¶ 14}** The information disseminated by appellant attempts to encourage people to read the Bible and to live up to its moral standards. These efforts are a good-faith attempt to disseminate information to spiritually advance and benefit mankind in general. Under the definition of charity followed by this court, appellant's activities constitute charitable purposes.

{¶ 15} The General Assembly has used the phrase "used exclusively" as a limitation in both R.C. 5709.07 (houses used exclusively for public worship) and R.C. 5709.12 (property used exclusively for charitable purposes). In *Moraine Hts. Baptist Church v. Kinney* (1984), 12 Ohio St.3d 134, 135, 12 OBR 174, 175, 465 N.E.2d 1281, 1282, this court held that for purposes of R.C. 5709.07, the phrase "used exclusively for public worship" was equivalent to "primary use." There is no indication that the phrase "used exclusively" as used in R.C. 5709.12 is to be interpreted differently than it is in R.C. 5709.07. Thus, when the BTA found that the primary use of the appellant's property was for an evangelic purpose it was equivalent to the "exclusive use" being for evangelic purposes, which we have found to be charitable purposes.

{¶ 16} Accordingly, for the reasons stated above we find the decision of the BTA to be unreasonable and unlawful, and therefore we reverse it.

*Decision reversed.*

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

———————————

**COOK, J., dissenting.**

{¶ 17} Because I conclude that the Tax Commissioner and Board of Tax Appeals ("BTA") correctly denied the charitable use exemption sought here by True Christianity Evangelism, I respectfully dissent.

I

{¶ 18} The BTA is vested "with wide discretion in determining the weight to be given to evidence and the credibility of witnesses which come before it. It is not the function of this court to substitute its judgment for that of the board on factual issues, but only to determine from the record whether the decision rendered by [the] board is unreasonable or unlawful. Thus, the proper scope of this court's review of the board's decision * * * is solely to determine from the record if the

board's decision is supported by any probative evidence." (Citations omitted.) *Monsanto Co. v. Lindley* (1978), 56 Ohio St.2d 59, 63, 10 O.O.3d 113, 115, 381 N.E.2d 939, 942. The majority reverses the BTA's decision here without mentioning this deferential standard of review, but the record contains ample probative evidentiary support for the board's conclusions.

{¶ 19} The majority assigns great weight to one particular finding in the record—the BTA's statement that "the primary use to which the property is devoted is an evangelistic one." Because this court has previously determined that "exclusive use" under another tax exemption statute can (sometimes) really mean "primary use," and because evangelistic uses can (sometimes) be characterized as charitable uses, the majority supports its decision granting the exemption with that phrase. A close reading of the BTA's decision, however, suggests that the majority has read this language out of context and overlooked other key evidence in the record.

{¶ 20} When the BTA wrote that "the primary use to which the property is devoted is an evangelistic one," it did so in an attempt to analytically distinguish between a broad category of charitable uses and a narrower category of evangelistic uses. The BTA reasoned:

"While aspects of Botzko's activities, and those of the institutions with which he is associated, may arguably be considered charitable in nature, the primary use to which the property is devoted is an evangelistic one. As tribunals have acknowledged in the past, a distinction may be drawn between charitable and religious institutions and the activities in which they engage."

{¶ 21} To support this distinction, the BTA relied on several cases from this court. See, *e.g.*, *Summit United Methodist Church v. Kinney* (1983), 7 Ohio St.3d 13, 7 OBR 406, 455 N.E.2d 669; *Summit United Methodist Church v. Kinney* (1982), 2 Ohio St.3d 72, 2 OBR 628, 442 N.E.2d 1298; and *Operation Evangelize-Youth Mission, Inc. v. Kinney* (1982), 69 Ohio St.2d 346, 23 O.O.3d 315, 432

N.E.2d 200. The majority declines to follow these cases, deciding that they incorrectly limited the application of R.C. 5709.12 to the specific entities described in R.C. 5709.121.

{¶ 22} Assuming, *arguendo*, that the majority correctly declines to follow the cases upon which the BTA relied, the BTA knew that the distinction it was attempting to draw between charitable and evangelistic uses was a narrow one—if such a distinction existed at all. Like today's majority, the board referred to the very broad definition of "charity" that appeared in this court's *Planned Parenthood* syllabus over three decades ago. *Planned Parenthood Assn. of Columbus, Inc. v. Tax Commr.* (1966), 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the syllabus. Due to the breadth of that definition, the BTA anticipated that at least some of Botzko's evangelical uses might also be deemed charitable ones. Accordingly, the board provided an alternative theory in support of its decision to deny the exemption. The board expressly noted that, "[t]o the extent an argument may continue to exist that evangelic and charitable are synonymous, we acknowledge the other uses of the property which are clearly not 'exclusively charitable.' * * * [W]hile a portion of Botzko's use of the subject property *may* be charitable in nature, we are unable to conclude that the use of the subject property is *exclusively* for charitable purposes.' " (Emphasis *sic*.) The "other uses" that the board expressly referred to here included (1) Botzko's storage of clothing and other personal items at the property, (2) Botzko's use of exercise equipment at the property to improve his own physical condition, and (3) Botzko's use of the property to prepare "personal ads in newspapers with the apparent purpose of soliciting women interested in leading a similar lifestyle such as his own."

{¶ 23} In addition to these findings, which the majority does not discuss, the record contains Botzko's own testimony that he had not "really kept track of what was done" at the property. Because it was True Christianity Evangelism's burden to demonstrate entitlement to the charitable use exemption, *Episcopal*

*Parish of Christ Church, Glendale v. Kinney* (1979), 58 Ohio St.2d 199, 12 O.O.3d 197, 389 N.E.2d 847, the BTA's decision to uphold the Tax Commissioner's denial of the exemption is supported by probative evidence of record—the sworn testimony of True Christianity Evangelism's president, Botzko.

II

**{¶ 24}** I also question the majority's reliance on *Moraine Hts. Baptist Church v. Kinney* (1984), 12 Ohio St.3d 134, 12 OBR 174, 465 N.E.2d 1281. Instead of undercutting the BTA's analysis, *Moraine Hts.* actually supports it.

**{¶ 25}** In *Moraine Hts.*, this court was asked to determine whether a forty-nine-acre church camp containing various separate buildings and facilities qualified for the R.C. 5709.07 exemption. To do so, this court reviewed three prior cases concerning this exemption, which requires the taxpayer to show that the property is "used exclusively for public worship." *Id.* at 135, 12 OBR at 175, 465 N.E.2d at 1282, citing *In re Bond Hill-Roselawn Hebrew School* (1949), 151 Ohio St. 70, 38 O.O. 527, 84 N.E.2d 270; *Bishop v. Kinney* (1982), 2 Ohio St.3d 52, 2 OBR 594, 442 N.E.2d 764; and *Summit United Methodist Church v. Kinney* (1983), 7 Ohio St.3d 13, 7 OBR 406, 455 N.E.2d 669. Like *Moraine Hts.* itself, each of these three cases addressed properties of a character far different from the two-story house at issue here.

**{¶ 26}** In *Bond Hill-Roselawn*, for example, this court held that a Hebrew school building qualified for the public worship exemption even though the entire building was not used exclusively for public worship—a caretaker and his family lived in three rooms above the first floor. 151 Ohio St. at 71-73, 38 O.O. at 528, 84 N.E.2d at 272. The *Bond Hill-Roselawn* court reasoned that church buildings often contain certain rooms that are not exclusively used for public worship—such as rooms used for cooking or for Boy Scout meetings—and that the existence of such rooms *within* a church building should not foreclose exemption of the building itself. *Id.* "Certainly it was not the intention of the people that their words 'used

exclusively for public worship,' should be so literally construed that any such uses would prevent tax exemption of a church building." *Id.* at 73, 38 O.O. at 528, 84 N.E.2d at 272.

{¶ 27} After *Bond Hill-Roselawn*, in *Bishop v. Kinney,* this court also granted the R.C. 5709.07 exemption to a parish hall that was used primarily for religious purposes but was also used occasionally for social gatherings and bingo games. 2 Ohio St.3d at 52-53, 2 OBR at 594-595, 442 N.E.2d at 765-766. In *Summit United Methodist Church,* on the other hand, this court upheld the BTA's denial of the exemption for the educational wing of a parish center that was used for Sunday school but leased to the Ohio State University as a daycare center on weekdays. 7 Ohio St.3d at 15, 7 OBR at 407-408, 455 N.E.2d at 670-671.

{¶ 28} The taxpayer in *Moraine Hts.* claimed that "although recreational activities are conducted to entertain the youth attending the camp, the primary use of the camp and its facilities is to create an atmosphere conducive to the worship of God. * * * [T]he camp-like environment promotes a better atmosphere to instill Christian principles." *Moraine Hts.*, 12 Ohio St.3d at 136, 12 OBR at 176, 465 N.E.2d at 1283. Applying *Bond Hill-Roselawn, Bishop,* and *Summit United Methodist,* this court disagreed and affirmed the board's denial of the R.C. 5709.07 exemption. *Id.* at 136, 12 OBR at 176-177, 465 N.E.2d at 1282-1283. The *Moraine Hts.* court conceded that the phrase "used exclusively for public worship" should not be so literally construed as to defeat exemption for multipurpose church buildings that may contain some rooms where nonreligious activities occur. *Id.* at 136, 12 OBR at 176, 465 N.E.2d at 1282. Even so, the *Moraine Hts.* court reasoned:

"The record demonstrates that of the forty-nine acres sought to be exempted, only the chapel is used primarily for public worship, and it has been exempted from taxation. The balance of the land, including the lodging facilities, swimming pool, cafeteria, as well as the recreational and nature areas, are, at best,

*merely supportive of appellant's goal to promote worship*." (Emphasis added.) *Id.* at 136, 12 OBR at 177, 465 N.E.2d at 1283.

{¶ 29} Accordingly, though *Moraine Hts.* does indeed stand for the proposition that the statutory qualifier "used exclusively" in the tax code should not be construed so strictly as to deny an exemption for every multipurpose church facility, the case still requires the taxpayer to meet a substantial burden in order to qualify for exemption. The *Moraine Hts.* taxpayer's asserted uses of the facilities located on the property—to instill Christian values and create an atmosphere conducive to worship—though laudable, did not suffice to meet this burden. The BTA drew a similar conclusion about True Christianity Evangelism's asserted uses of the property involved here, and for the foregoing reasons, it is a conclusion that I would uphold.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

––––––––––––––––––

*Thompson Hine & Flory, L.L.P.,* and *Karen Kelly Grasso,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Phyllis J. Shambaugh,* Assistant Attorney General, for appellee.

––––––––––––––––––