NORTHEAST OHIO PSYCHIATRIC INSTITUTE, APPELLANT,
*v.* LEVIN, TAX COMMR., APPELLEE.

[Cite as *Northeast Ohio Psych. Inst. v. Levin,*
121 Ohio St.3d 292, 2009-Ohio-583.]

(No. 2008–0033—Submitted November 19, 2008—Decided February 17, 2009.)

CUPP, J.

{¶ 1} Appellant, Northeast Ohio Psychiatric Institute ("Northeast"), seeks to exempt 68 percent of a building and its grounds from real property taxation through a "split listing" pursuant to R.C. 5713.04 for tax year 2003. The portion of the building and grounds that is the subject of the exemption was leased to and used by another entity, Portage Path Behavioral Health, which operates the Portage Path Community Health Center ("Portage Path") at the site. Portage Path provides behavioral health services to the general public pursuant to a provider agreement with the Summit County Alcohol, Drug Addition, and Mental Health ("ADAMH") Board.

{¶ 2} Exemption is sought for charitable use pursuant to R.C. 5709.12(B) and 5709.121 by virtue of the behavioral health services provided by Portage Path at the site. The Tax Commissioner and the Board of Tax Appeals ("BTA") denied exemption, ruling that Northeast cannot rely for an exemption on the charitable activities of Portage Path, because Northeast itself does not qualify as a "charitable institution" under R.C. 5709.121.

{¶ 3} On appeal to this court, Northeast renews its argument that four factors justify exempt status for the property: (1) Northeast's own status as a qualifying entity under Section 501(c)(3) of the Internal Revenue Code; (2) Northeast's affiliation with Portage Path; (3) Portage Path's activities on the subject premises; and (4) Portage Path's ultimate enjoyment and use of any income generated by Northeast's activities. According to Northeast, these factors establish that Northeast qualifies as a "charitable institution" under R.C. 5709.121 and that, as a result, Northeast may rely on the lessee's own charitable activities to claim exemption for the premises. R.C. 5709.121(A)(1)(b). We disagree, and we therefore affirm.

## Facts

{¶ 4} Northeast's articles of incorporation establish the entity's nature as a nonprofit corporation organized to "carry out the purposes of any organization described in sections 501(c)(3) and 509(a)(1) or (2) of the Internal Revenue Code, as it now exists or is hereafter amended." More specifically, the corporate regulations set forth the purpose of Northeast: to "operate in connection with and carry out the exempt purpose of Portage Path Community Mental Health Center." Its purpose includes "promot[ing] mental health by meeting a community need to concentrate the mental health resources of the region in order to increase and improve the diagnosis and treatment of emotional illness." Additional stated purposes include the training of mental health professions and research on mental illness. The articles and regulations contain typical provisions prohibiting private inurement of corporate assets.

{¶ 5} Portage Path furnishes behavioral health services to the public pursuant to a provider agreement with the Summit County ADAMH board. The agreement allows Portage Path to obtain reimbursement for services if it abides by various covenants. Among other things, the agreement states, "No person in need of service, who is otherwise eligible, shall be denied services based on that person's inability to pay for necessary services providing the agency adheres to the guidelines for the 'Ability to Pay Scale.' "

{¶ 6} Organizationally, a majority of the 15 trustees who govern Northeast must be on the board of Portage Path. According to Jerome Kraker, the president of both Northeast and Portage Path, who testified at the BTA hearing, Northeast and its board of trustees "exist to support Portage Path and mental health operations in Ohio."

{¶ 7} Kraker offered testimony in support of the charitable status of Portage Path, testifying among other things that "Portage Path provides behavioral health psychiatric services to the residents of Summit County who otherwise would not be able to afford such services." Those services include a 24-hour, seven-day-a-week emergency service, a "24–7" suicide hotline, and a partial hospitalization program. Patients do not pay the cost of care entirely out of pocket; Portage Path uses a sliding scale of fees based on financial-need criteria, with Summit County reimbursing most, but not all, unpaid costs. Another 35 percent of patients are covered by Medicare or Medicaid.

{¶ 8} With respect to the use of the 5,700 square-foot building at issue, Kraker testified that as of 2003, some 68 percent of the space was used by Portage Path. Nine hundred eighty square feet were leased to a physician for his office, and another 582 square feet were leased to Lab Care, which performs much of its lab work for Portage Path patients by referral. The Tax Commissioner's determination characterizes Lab Care as for profit.

{¶ 9} As for rent, Portage Path was obligated to pay $5,500 per month, but in practice, Northeast would discount the rent to make sure Portage Path was not paying more than 68 percent of the cost of operating the building. In 2003, the private physician paid $17,425, and Lab Care paid $11,000. Those amounts were not subject to being discounted, and to the extent they exceeded building cost, the surplus would "benefit Portage Path Behavioral Health." Notably, Portage Path's rent was not discounted so that the total rent proceeds from all tenants would equal the building costs—in other words, Northeast retained any surplus generated by the sum of Portage Path's paying its costs and of the other tenants paying fixed amounts. Indeed, the financial statements for 2002 and 2003 showed that rent revenue exceeded building-associated costs for both years.

{¶ 10} In addition to owning and leasing property, Northeast engaged as of the tax-lien date in providing psychiatric-staffing services, albeit from a different location. Those services supplied revenues of $932,446 for 2003 and $616,096 for 2002, offset by related expenses of $809,833 and $566,041 respectively. On cross-examination, Kraker admitted that furnishing psychiatric-staffing service and leasing property constituted "primary operations" of Northeast at the relevant time. During the two years, expenses exceeded revenues by virtue of a "Life-scapes" program, an off-site mental health clinic operated by Northeast. No testimony was offered on direct examination concerning the Lifescapes program.

## Analysis

### *Northeast does not qualify as a charitable institution.*

{¶ 11} The central issue we confront is whether a nonprofit entity constitutes a "charitable institution" under R.C. 5709.121 when it (1) enjoys Section 501(c)(3) status under the Internal Revenue Code and (2) is organized to hold and lease real property for use by another charitable institution. That question is crucial because the court has long held that under the general exemption for "exclusive charitable use" of property set forth at R.C. 5709.12(B), it is the *owner's use* of the property, not a lessee's use, that determines whether the property should be exempted. See *First Baptist Church of Milford v. Wilkins*, 110 Ohio St.3d 496, 2006-Ohio-4966, 854 N.E.2d 494, ¶ 12–13, citing *Lincoln Mem. Hosp., Inc. v. Warren* (1968), 13 Ohio St.2d 109, 110, 42 O.O.2d 327, 235 N.E.2d 129. Under that principle, the property at issue plainly would not qualify for exemption, because Northeast is using that property for leasing, not for providing mental health care.

{¶ 12} As a result Northeast must qualify, if at all, under R.C. 5709.121. That provision expanded the charitable-use exemption to encompass (among other situations) the situation in which an entity that qualifies as a "charitable institu-tion" itself leases property to another charitable institution for charitable pur-

poses. R.C. 5709.121(A)(1)(b).[1] See *First Baptist Church,* 110 Ohio St.3d 496, 2006-Ohio-4966, 854 N.E.2d 494, ¶ 15, 16; *Community Health Professionals, Inc. v. Levin,* 113 Ohio St.3d 432, 2007-Ohio-2336, 866 N.E.2d 478, ¶ 17, 18.

{¶ 13} Logically, the first among Northeast's arguments is the contention that because Northeast has a federal certification as a 501(c)(3) organization, it should enjoy a legally conclusive presumption that it qualifies as a charitable institution under R.C. 5709.121, so long as it complies with its articles and bylaws. We do not consider this contention, because it is jurisdictionally barred. Northeast did not specify the failure to apply such a presumption as an error, either in its notice of appeal to the BTA or in its notice of appeal to the court. That omission is striking in light of the Tax Commissioner's explicit statement that "[a]lthough organized as an IRC 501(c)(3) corporation there is no evidence in the record that shows that the applicant is a charitable entity." By not asserting as error the failure by the commissioner and the BTA to apply a presumption based on 501(c)(3) status, Northeast failed to create jurisdiction to obtain relief on that ground. See *Satullo v. Wilkins,* 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 23, 24; *Dayton–Montgomery Cty. Port Auth. v. Montgomery Cty. Bd. of Revision,* 113 Ohio St.3d 281, 2007-Ohio-1948, 865 N.E.2d 22, ¶ 32.

{¶ 14} Next, we address Northeast's contention that the totality of evidence in the record established its status as a "charitable institution" as a matter of law. In this regard, the most significant precedent is our decision in *OCLC Online Computer Library Ctr., Inc. v. Kinney* (1984), 11 Ohio St.3d 198, 11 OBR 509, 464 N.E.2d 572. In that case, we stated that the status of an institution as "charitable" under R.C. 5709.121 depends upon the "charitable activities of the taxpayer seeking the exemption," not the "charitable nature of the institutional customers." Id. at 201, 11 OBR 509, 464 N.E.2d 572. A clear corollary of that principle applies in this case, namely, an entity that leases property to another must establish its charitable status based on the range of *its own activities* and may not rely upon the activities of a particular lessee.

{¶ 15} In this case, the BTA reasonably and lawfully concluded that Northeast's own activities did not qualify it as a charitable institution for purposes of R.C. 5709.121. Northeast generates substantial revenue through leasing and through providing psychiatric-staffing services. Although Northeast ties Portage Path's rent to that entity's share of building maintenance costs, other tenants pay without regard to cost, including a for-profit physician's office and a laboratory-services provider. Additionally, in 2003, Northeast operated an off-site mental

---

1. 2005 Am.Sub.H.B. No. 66 amended R.C. 5709.121(A)(1)(b). As of 2003, the tax year at issue, this provision was codified at R.C. 5709.121(A)(2). 149 Ohio Laws, Part IV, 6465, 6596.

health clinic, but no evidence was presented as to whether that clinic operated on a charitable basis.

{¶ 16} Northeast argues that its income-producing activities actually redound to the advantage of the charitable activities of Portage Path, which derives the ultimate economic benefit on account of its control of Northeast. It is true that Northeast operates on a nonprofit basis, and there is no evidence of private inurement of its earnings. But that fact alone does not establish charitable status. To be sure, we have held that charitable activities may generate incidental revenue and still qualify as charitable. *Community Health Professionals, Inc. v. Levin*, 113 Ohio St.3d 432, 2007-Ohio-2336, 866 N.E.2d 478, ¶ 23; *Girl Scouts–Great Trail Council v. Levin*, 113 Ohio St.3d 24, 2007-Ohio-972, 862 N.E.2d 493, ¶ 17. But that does not mean, as Northeast appears to suggest, that all income-producing activities will qualify as charitable merely because their proceeds are applied to charitable purposes.

{¶ 17} In this regard, Northeast's reliance on *Akron Golf Charities, Inc. v. Limbach* (1987), 34 Ohio St.3d 11, 516 N.E.2d 222, is misplaced. The entity in that case existed in order to organize an annual golf outing that raised money for local charities. By contrast, Northeast engages in the ongoing business activities of leasing and providing staffing services—activities that generate substantial revenue and that have not been found in other cases to be charitable in character. See *Hubbard Press v. Tracy* (1993), 67 Ohio St.3d 564, 566, 621 N.E.2d 396 (printing envelopes for use by churches not in itself a charitable activity).

{¶ 18} The present case resembles *OCLC*. In that case, OCLC engaged in "the business of providing a computerized library network, the storing of library related bibliographical catalog data, and the selling or licensing the use of equipment necessary to gain access to such stored data or to communicate with member organizations having a contractual relationship to OCLC." *OCLC Online Computer Library Ctr., Inc. v. Kinney* (Oct. 11, 1983), BTA No. 81–D–602. As the BTA explained in *OCLC*, such continuous business activity is not charitable inasmuch as "[t]here are many data processing corporations providing data storage capabilities for the benefit of its users." Id. We affirmed the decision of the BTA in *OCLC*, 11 Ohio St.3d 198, 11 OBR 509, 464 N.E.2d 572. It is *OCLC*, not *Akron Golf Charities*, that applies to the facts of the present case.

{¶ 19} Northeast also seeks support from our decision in *Community Health Professionals, Inc. v. Levin*, 113 Ohio St.3d 432, 2007-Ohio-2336, 866 N.E.2d 478, but that case is inapposite. In that case, the property owner, Community Health Professionals, did lease portions of the property to affiliated charitable institutions, but that activity was incidental to its main purpose: it "provide[d] skilled, in-home nursing care and hospice services to those in the community who have

approval and a care plan from a physician." Id. at ¶ 3. By contrast, none of the services that Northeast provides has been shown to be charitable in character.

{¶ 20} The BTA reasonably and lawfully found that Northeast's activities were not charitable and properly concluded that Northeast was not entitled to an exemption under R.C. 5709.121.

*Portage Path's status as a charity is not before the court.*

{¶ 21} Under R.C. 5709.121(A)(1)(b), both the lessor and the lessee of real property must be charitable institutions. In his final determination, the commissioner found no evidence that Portage Path qualified as a charitable institution. At the BTA, Northeast presented evidence that Portage Path (1) provided its care pursuant to an ADAMH-board provider agreement, (2) did so on a sliding-scale basis, and (3) did so without regard to ability to pay. The BTA found that "Portage Path is a charitable entity."

{¶ 22} The Tax Commissioner contends, as an alternative ground for affirmance, that the BTA lacked a factual record to support this finding. Because we affirm the BTA's determination that Northeast is not a charitable institution, and because that determination disposes of Northeast's exemption claim, we need not address the question whether the BTA correctly found that Portage Path itself qualifies as a charitable institution.

{¶ 23} We do note, however, that the commissioner's contention is jurisdictionally barred. In order to contest the finding, the Tax Commissioner needed to file a protective cross-appeal and assign the finding as an error of the BTA. *Polaris Amphitheater Concerts, Inc. v. Delaware Cty. Bd. of Revision,* 118 Ohio St.3d 330, 2008-Ohio-2454, 889 N.E.2d 103, ¶ 13–15. As *Polaris* explains, "Our cases do not permit us to rectify an alleged error of the BTA unless that error was set forth in a proper notice of appeal, even if the alleged error aggrieved the party only because of the success of another party's appeal." Id. at ¶ 14. Because the commissioner did not file a protective cross-appeal, the court has no jurisdiction to grant him relief on that finding.

## Conclusion

{¶ 24} For all the foregoing reasons, the BTA acted reasonably and lawfully when it affirmed the commissioner's denial of Northeast's exemption application. We therefore affirm the BTA's decision.

Decision affirmed.

MOYER, C.J., and PFEIFER, O'CONNOR, O'DONNELL, and LANZINGER, JJ., concur.

LUNDBERG STRATTON, J., dissents.

LUNDBERG STRATTON, J., dissenting.

{¶ 25} I believe that the portion of the property leased by the Northeast Psychiatric Institute ("Northeast") to Portage Path Community Health Center ("Portage Path") is exempt from taxation under R.C. 5709.12. As a result, I respectfully dissent.

{¶ 26} Property is exempt from taxation under R.C. 5709.12 if it belongs to an institution, *charitable or otherwise,* and it is used by that institution exclusively for a charitable purpose. *True Christianity Evangelism v. Zaino* (2001), 91 Ohio St.3d 117, 118, 742 N.E.2d 638. R.C. 5709.121(A)(2) provides that the phrase "used exclusively for charitable purposes" within R.C. 5709.12(B) includes property "belonging to a *charitable* * * * institution" that "is made available under the direction or control of such institution * * * for use in furtherance of or incidental to its charitable, educational, or public purposes and not with the view to profit." (Emphasis added.)

{¶ 27} The majority holds that the property in question is not exempt from taxation under R.C. 5709.12(B) as "property belonging to institutions that is used exclusively for charitable purposes" or, under R.C. 5709.121(A), as "property belonging to a charitable or educational institution" that "is made available under the direction or control of such institution * * * for use in furtherance of or incidental to its charitable, educational or public purposes and not with the view to a profit." In the first instance, the majority holds that Northeast "is using the property for leasing, not for providing mental health care." In the second instance, the majority holds that Northeast is not a charitable institution, and therefore it cannot rely on the definition in R.C. 5709.121, which applies only to charitable institutions.

{¶ 28} I would hold that the property in question is exempt from taxation under R.C. 5709.12 because it belongs in fact to Portage Path, which is a charitable institution, and it is used by Portage Path exclusively for a charitable purpose.

{¶ 29} R.C. Chapter 340 of the Ohio Revised Code created Alcohol, Drug Addiction, and Mental Health ("ADAMH") districts in Ohio to provide community-based mental-health care. R.C. 340.02. Each district contains an ADAMH board. Id. ADAMH boards are required to hire service providers to administer mental-health-care services. R.C. 340.03(A)(8)(a).

{¶ 30} In Summit County, the ADAMH board contracted with Portage Path to provide "behavioral health psychiatric services" to persons irrespective of whether they are able to pay for such care. Jerome T. Kraker, president of both Northeast and Portage Path, testified that the board of trustees determined that it would be financially advantageous for Portage Path to own its own treatment

facility. However, Kraker testified that Portage Path's contract with ADAMH did not provide Portage Path with authority to purchase property. Thus, Portage Path created Northeast to acquire and hold property, which it leased back to Portage Path. Northeast is nothing more than a mechanism used to acquire property for Portage Path.

{¶ 31} Northeast's organizational documentation requires a majority of its board of trustees to be members of Portage Path's board of trustees. In fact, all of Northeast's trustees are trustees of Portage Path. Portage Path and Northeast also share the same president. Thus, Portage Path controls the actions of the Institute.

{¶ 32} This evidence indicates that Northeast is merely an instrument created and controlled exclusively by Portage Path and used by Portage Path primarily to secure property for its treatment center. This structure is similar to that in *First Baptist Church of Milford v. Wilkins,* 110 Ohio St.3d 496, 2006-Ohio-4966, 854 N.E.2d 494, in which a church sought a tax exemption for its print shop, which was used by a nonprofit corporation called Bearing Precious Seed–Milford, Inc. ("BPS") to print Bibles. BPS and the church shared the same trustees, and testimony indicated that BPS was part of the church. Id. at ¶ 28 (Lundberg Stratton, J., dissenting). In my dissent, I concluded that the nonprofit corporation was nothing more than an alter ego of the church, and therefore in determining whether the property was exempt from taxation, we should conclude that the church itself was the user of the print shop. Id.

{¶ 33} Applying that logic in the instant case, I would hold that for purposes of R.C. 5709.12, the property in question in fact belongs to Portage Path, not Northeast. Thus, I believe that the first element required for an exemption under R.C. 5709.12 is satisfied because the property in question effectively belongs to Portage Path, which is a charitable institution, as determined by the BTA below.

{¶ 34} In order to be exempt from taxation, R.C. 5709.12 also requires that the property in question be "used exclusively for charitable purposes." Pursuant to the "split listing" application for exemption, the only property sought to be exempted was the property used by Portage Path for its treatment center. Portage Path uses the property as a treatment center to provide mental-health-care services to those who could otherwise not afford such treatment. The BTA below held that these services were charitable in nature as a matter of law.

{¶ 35} Therefore, I would find that the property in question belongs to a charitable institution, Portage Path, and that it is used by Portage Path exclusively for the charitable purpose of providing mental-health treatment for those who could not otherwise afford such treatment. Accordingly, I would hold that this property is exempt from taxation under R.C. 5709.12.

{¶ 36} To hold otherwise would place form over substance and deprive organizations of tax exemptions that are justified by work that is clearly charitable. As Northeast states in its brief, "Corporate structure should not obscure charitable purpose, nor create anomalies in exemptions." Funding for social services such as mental-health care for the underprivileged is scarce enough and is increasingly being cut during these tough economic times. Permitting the taxation of the property herein further deprives a charitable-care provider of funding to continue treatment, much of which is provided by the state through the ADAMH board in the first place. Peter is being robbed to pay Paul instead.

{¶ 37} Where the BTA has denied a tax exemption that is not consistent with legislative intent, the General Assembly has acted to correct such decisions. For example, in *Columbus Bd. of Edn. v. Limbach* (June 26, 1992), BTA No. 86–H–566, 1992 WL 153126, *14, the BTA denied a property-tax exemption to the American Chemical Society, a nonprofit professional association. In 1993, the General Assembly amended R.C. 5709.12 to establish that associations like those in *Limbach* were "conclusively presumed" to be charitable or educational institutions. See 144 Ohio Laws, Part IV, 6487, 6491. Similarly, if the majority has misconstrued the General Assembly's intent in denying a tax exemption in the instant case, a legislative fix may be needed here as well. Therefore, I respectfully dissent.

---

Vorys, Sater, Seymour & Pease, L.L.P., and Mary C. Henkel, for appellant.

Richard Cordray, Attorney General, Sheryl Creed Maxfield, First Assistant Attorney General, and Damion M. Clifford, Assistant Attorney General, for appellee.

Vorys, Sater, Seymour & Pease, L.L.P., John J. Kulewicz, and Michael J. Hendershot, urging reversal for amicus curiae Ohio Council of Behavioral Healthcare Providers.

Brindza, McIntyre & Seed, L.L.P., David H. Seed, and Daniel McIntyre, urging affirmance for amici curiae Ohio School Boards Association, Ohio Association of School Business Officials, and Buckeye Association of School Administrators.