[Cite as *Literary Club v. McClain*, 2020-Ohio-3956.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| THE LITERARY CLUB, | : | APPEAL NO. C-190479 |
| | | TRIAL NO. 2017-985 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| JEFFREY A. MCCLAIN, TAX | : | |
| COMMISSIONER OF OHIO, | | |
| Defendant-Appellee. | : | |

Appeal From: Ohio Board of Tax Appeals

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 5, 2020

*Frost Brown Todd, L.L.C.,* and *Joseph J. Dehner*, and *Taft Stettinius and Hollister, L.L.P.,* and *Thomas R. Schuck*, for Plaintiff-Appellant,

*David A. Yost*, Ohio Attorney General, and *Sophia Hussein*, Assistant Attorney General, for Defendant-Appellee.

**CROUSE, Judge.**

{¶1}   The Literary Club ("Club") is a private organization whose primary function, as described in its constitution, is to "provide a forum for its members to read original papers, written solely by them, to an audience limited to the members of the Club and their guests." The Club owns a historic house located in downtown Cincinnati, Ohio.

{¶2}   The Club applied for a real property tax exemption and remission pursuant to R.C. 5709.12 and 5709.121. Property belonging to a charitable or educational institution qualifies for tax exemption if it meets certain conditions listed in R.C. 5709.121(A). Property belonging to any institution qualifies for tax exemption under R.C. 5709.12 if it is used exclusively for charitable purposes.

{¶3}   The Ohio Tax Commissioner ("Commissioner") denied the application, finding that "there is no evidence of charitable activities at the subject property" and "that a portion of the subject property is used as a residence." The Club appealed to the Ohio Board of Tax Appeals ("BTA"), which, after an evidentiary hearing, affirmed the Commissioner's decision.

{¶4}   The Club has appealed, arguing in three assignments of error that (1) the BTA erred in holding that the Club failed to prove that it was entitled to a real property tax exemption, (2) the BTA incorrectly interpreted and applied R.C. 5709.12 and 5709.121, and (3) the BTA's decision denied the Club equal protection under the law.

{¶5} For the reasons discussed below, we overrule the Club's first and second assignments of error, find that we lack jurisdiction to consider the merits of its third assignment of error, and affirm the judgment of the BTA.

### Factual Background

{¶6} At the hearing before the BTA, Thomas Murphy, the Club president, testified regarding the membership requirements and activities of the Club. He stated that the Club is an all-male organization, and its activities are restricted to members and invited guests. Potential members must be sponsored by a current member, submit a writing sample, which must be reviewed and approved by the "board of management," and then be approved by a vote of the other members. Members prepare original papers that they present to other members of the Club at weekly meetings held at the property in question between the months of April and September. Murphy testified that the Club also occasionally hosts open houses at the property in question. The purpose of the open houses is to invite nonmembers to see the house and learn more about the Club.

{¶7} Murphy testified that new members attend a seminar about writing and presenting "an excellent piece of writing." Members can also participate in a "writer's circle" once a month, where 11 members of the Club gather and critique each other's work and discuss writing and literature. He testified that the writer's circle has been "described by one of the members who is a professor emeritus of literature at Miami University as a master class in writing." Murphy testified that the presentation of weekly papers by experts in their respective fields was "tantamount to hearing a professor give a paper."

3

{¶8} Murphy testified that all of the papers produced by the Club's members are placed into bound volumes and stored in the library at the house, which is only open to Club members. He testified that some of the papers are made available to the public through the Cincinnati Historical Society, which stores them in bound volumes at the Cincinnati Museum Center.[1]

{¶9} Club members Richard Hague, Dr. Theodore Stryker, and Robert Vitz testified that the Club educates the general public through the papers it provides to the Museum Center, and by Club members who spread their knowledge to the larger literary community around Cincinnati.

{¶10} Hague is the current writer in residence at Thomas More College and a published author. He testified that some of the papers made available through the Museum Center serve as sources of knowledge and references for members of the public who are interested in researching a particular topic. He also testified that the information presented at Club meetings is shared with members of the wider literary community. Likewise, Stryker testified that the aim of the presentations is to spread knowledge among the members so that members will "spread this information across the citizenry."

{¶11} Vitz is the Club's historian and a retired professor of history. He testified that before he was a member, he utilized the papers made available to the public in his works on the history of the arts in Cincinnati. Papers can be about anything the writer thinks members will find of interest. Vitz testified that members often stay after a paper is read to give reactions to the paper and discuss ideas about

---

[1] Club historian Robert Vitz testified that the Cincinnati Historical Society no longer exists, but the papers are still made available through the Museum Center.

the paper. However, it is not mandatory for members to participate in these informal discussions.

{¶12} Vitz testified that the Club uses the house for its meetings and open houses. It does not use the house for social events or rent the house out for other organizations to use for social events.

{¶13} Murphy testified that the Club allows a caretaker couple to live rent free on the second floor of the house to help with upkeep and to reduce the cost of insurance.

### Standard of Review

{¶14} We review the BTA's decision to determine if it was "reasonable and lawful." *Kinnear Rd. Redevelopment, L.L.C. v. Testa*, 151 Ohio St.3d 540, 2017-Ohio-8816, 90 N.E.3d 926, ¶ 14; *see* R.C. 5717.04. In making this determination, we review the legal issues de novo. *Kinnear* at ¶ 14. Any facts found by the BTA will be affirmed if the record contains reliable and probative support for the findings. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14.

{¶15} Tax exemptions are a matter of legislative grace and are the exception to the rule. *In re Estate of Roberts*, 94 Ohio St.3d 311, 314, 762 N.E.2d 1001 (2002). "The onus is on the taxpayer to show that the language of the statute 'clearly express[es] the exemption' in relation to the facts of the claim." *Anderson/Maltbie Partnership v. Levin*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 16, quoting *Ares, Inc. v. Limbach*, 51 Ohio St.3d 102, 104, 554 N.E.2d 1310 (1990). Therefore, in doubtful cases, the exemption is denied. *Anderson/Maltbie* at ¶ 16.

{¶16} Whether an institution qualifies as an educational or charitable institution is primarily an issue of fact, "the determination of which lies within the

5

province of the taxing authorities and thus merits our deference." *Rural Health Collaborative of S. Ohio, Inc. v. Testa*, 145 Ohio St.3d 430, 2016-Ohio-508, 50 N.E.3d 486, ¶ 24.

### First Assignment of Error

{¶17} In its first assignment of error, the Club generally attacks the BTA's findings of fact and the weight it gave to the evidence. The Club contends that the BTA and the Commissioner were prejudiced against the Club because it is a private all-male institution. The Club contends that the BTA substituted prejudice for testimony and documentary evidence in the record in order to reach a conclusion that is not supported by probative evidence and is unreasonable and unlawful.

{¶18} Specifically, the Club contends that the BTA ignored the testimony of five "expert" witnesses that established the educational and charitable nature of the Club. However, none of the witnesses were qualified as expert witnesses, and all of them are members of the Club. "The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16. After reviewing the record, it is clear that the BTA's decision was based upon the testimony of the witnesses and the documentary exhibits admitted. And, as will be discussed below, its conclusions are supported by reliable and probative evidence and are reasonable and lawful. The first assignment of error is overruled.

### Second Assignment of Error

**{¶19}** In its second assignment of error, the Club argues that the BTA incorrectly interpreted and applied the exemptions on property used for charitable or educational purposes contained in R.C. 5709.12 and 5709.121.[2]

**{¶20}** R.C. 5709.12(B) provides in part, "Real and tangible personal property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation." R.C. 5709.12(B) does not require a finding that the institution is a charitable institution. *Cincinnati Community Kollel v. Testa*, 135 Ohio St.3d 219, 2013-Ohio-396, 985 N.E.2d 1236, ¶ 23. Rather, the key determination is whether the property is used exclusively for charitable purposes. *Id.* "But if the property belongs to a charitable or educational institution, R.C. 5709.121 defines what constitutes exclusive use of property in order to be exempt from taxation." *Id.*

**{¶21}** Therefore, property may be tax exempt in two ways: (1) pursuant to R.C. 5709.121 if it belongs to a charitable or educational institution and meets one of the specific circumstances listed in 5709.121(A); or (2) pursuant to R.C. 5709.12(B) if it belongs to any institution and is used exclusively for charitable purposes. *Chagrin Realty, Inc. v. Testa*, 154 Ohio St.3d 352, 2018-Ohio-4751, 114 N.E.3d 204, ¶ 13; *Case W. Res. Univ. v. Wilkins*, 105 Ohio St.3d 276, 2005-Ohio-1649, 825 N.E.2d 146, ¶ 18.

**{¶22}** First, we address the Club's claim that it is entitled to tax exemption under R.C. 5709.121. The Club argues that it is not necessary for us to find that it is a charitable or educational institution in order for the property to be tax exempt under

---

[2] We note that although the Club is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. 501(c)(3) status alone is not dispositive of whether it is tax exempt for purposes of R.C. 5709.12 or 5709.121. *Northeastern Ohio Psych. Inst. v. Levin*, 121 Ohio St.3d 292, 2009-Ohio-583, 903 N.E.2d 1188, ¶ 4, 20.

R.C. 5709.121. It contends that if its use of the property falls within one of the defined uses in R.C. 5709.121(A), then it is tax exempt. However, this argument is contradicted by the analysis used by the Ohio Supreme Court in *Cincinnati Community Kollel v. Testa* at ¶ 23, *Chagrin Realty* at ¶ 13, and *Case W. Res. Univ.* at ¶ 18. Only if we determine that the Club is an educational or charitable institution do we move on to subsections (A)(1)-(2) of R.C. 5709.121. *See Cincinnati Community Kollel v. Testa* at ¶ 23 ("[I]f the property belongs to a charitable or educational institution, R.C. 5709.121 defines what constitutes exclusive use of property in order to be exempt from taxation").

{¶23} The Club contends that the BTA improperly focused on the private nature of the Club in rendering its decision. While the Club's private nature did factor into the BTA's decision, (as discussed below, part of the analysis is whether the Club offers educational opportunities to the public or attempts to provide a benefit to the public) its ruling was not based upon the Club's private nature. In fact, the BTA stated, "It is not the Club's membership requirements that lead us to conclude that its activities are not charitable," and acknowledged that cases like *Herb Soc. of Am., Inc. v. Tracy,* 71 Ohio St.3d 374, 376, 643 N.E.2d 1132 (1994), have allowed a tax exemption where the institution consisted of private members. The Ohio Supreme Court has held that institutions with restricted membership may qualify as educational and charitable institutions, especially if membership is restricted in order to foster the education the institution promotes, reasoning that "[a]n informed member will better serve Society in its mission to educate the community than an uninformed member." *Id.*

### Educational Institution

{¶24} The Club contends that it is an educational institution. In *Cincinnati Community Kollel v. Levin*, 113 Ohio St.3d 138, 2007-Ohio-1249, 863 N.E.2d 147, ¶ 15, the Supreme Court of Ohio found that there are certain "attributes that ought to be required of any entity that seeks a tax exemption as an 'educational institution.' " *Id.* These attributes include: 1) the presence of both students and teachers; 2) educational opportunities offered to the public; 3) the transfer of knowledge and skills in one or more structured classes rather than in merely social activities; and 4) the primary function is the presentation of formal instruction. *Id.*

{¶25} In holding that the Club is not an educational institution, the BTA found that while there was evidence that instruction on writing and research occurred among Club members, the Club did not have any of the attributes cited by the court in *Cincinnati Community Kollel v. Levin*, "most notably the lack of formal instruction."

{¶26} In *Cincinnati Community Kollel v. Levin*, the court held that the kollel had presented sufficient probative evidence of its status as an educational institution. *Id.* at ¶ 16. The kollel's constitution stated that it "is organized and is to be operated exclusively for charitable and educational purposes." *Id.* The kollel provided "an environment of Torah study combining the advanced studies of the kollel staff scholars with a venue for community learning," by providing courses to the community on a variety of Jewish topics. *Id.* at ¶ 16-17. And the classes were open to the public at no cost. *Id.* at ¶ 17.

{¶27} The Club argues that it does not need "structured classes" and the "presence of both students and teachers" to be considered an educational institution.

The Club contends that its members are its faculty and students combined and that together they spread knowledge among members, guests, and the public.

{¶28} But the lack of structured classes and faculty and students is not the only reason the BTA found that the Club was not an educational institution. First, the Club does not "offer educational opportunities to the public." *See Cincinnati Community Kollel v. Levin*, 113 Ohio St.3d 138, 2007-Ohio-1249, 863 N.E.2d 147, at ¶ 15. Unlike the Cincinnati Community Kollel, the Club's meetings, seminars, library, and open houses are not open to the public, but only to members and their invited guests. While the Club provides an unknown number of papers, available only in hard copy, to the Museum Center for use by the general public, this falls short of demonstrating that the Club offers educational opportunities to the public.

{¶29} Second, the Club's "*primary* function" is not the "presentation of formal instruction." (Emphasis added.) *See id.* at ¶ 15. Undoubtedly, instruction occurs among members as a result of the Club's activities. Members can participate in a "writer's circle," and new members participate in a writing seminar. Papers can be about any topic which the presenter thinks the members might find of interest. The discussions held after the papers are presented are informal in nature, and members may, but are not required to, participate in discussions about the paper, nor are they required to discuss literature and writing generally. The *primary* function of the Club, as described in its constitution and reflected by its activities, is to "provide a forum for its members to read original papers, written solely by them, to an audience limited to the members of the Club and their guests."

{¶30} We find that the BTA's determination that the Club is not an educational institution for purposes of R.C. 5709.121 was supported by reliable and probative evidence.

**Charitable Institution**

{¶31} The Club also argues that it is a charitable institution. Whether an institution qualifies as a charitable institution under R.C. 5709.121 requires us to examine the "core activity" of the institution and determine whether that activity qualifies as charitable for property-tax purposes. *Rural Health Collaborative of S. Ohio, Inc.,* 145 Ohio St.3d 430, 2016-Ohio-508, 50 N.E.3d 486, at ¶ 23.

{¶32} The Ohio Supreme Court has defined charity as,

[T]he attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity.

*Planned Parenthood Assn. v. Tax Commr.*, 5 Ohio St.2d 117, 214 N.E.2d 222 (1966), paragraph one of the syllabus.

{¶33} "The dissemination of useful information to benefit mankind is, traditionally, charity." *Herb Soc. of Am.*, 71 Ohio St.3d at 376, 643 N.E.2d 1132. The Club argues that it disseminates useful information to the public by disseminating knowledge to its members through the reading of members' papers and by making some of its papers available to the public through the Museum Center. However, there was no evidence in the record as to how many papers have been made available

to the public or even which papers have been made available to the public through the Museum Center. A professional institution or society is not charitable where the "dominant purpose of its work is to benefit its members" and the public only receives an incidental benefit. *See Columbus Bd. of Edn. v. Joanne Limbach, Tax Commr. of Ohio and Am. Chem. Soc.,* BTA No. 86-H-566, 1992 WL 153126, *32 (June 26, 1992).

{¶34} Webster's Dictionary defines "disseminate" as "to spread abroad," and "to disperse throughout." *Merriam-Webster's Online Dictionary,* https://www.merriam-webster.com/dictionary/disseminate (accessed July 27, 2020). In the cases cited by the Club, the institutions' core activities revolved around spreading useful information to the public, not simply making useful information available as a secondary service. *See, e.g., Herb Soc. of Am.* at 374 (the institution held regular symposiums, lectures, and workshops that were open to the public, maintained a library open to the public, organized a "speakers' bureau" to respond to the public's speaking needs, produced lectures that could be used by requesting organizations, and maintained public herb gardens); *Am. Humanist Assn. v. Bd. of Tax Appeals,* 174 Ohio St. 545, 546, 190 N.E.2d 685 (1963) (the institution published magazines, books, and pamphlets and engaged lecturers).

{¶35} In determining the Club's core activities, it is useful to remember its purpose. The very first sentence of the Club's constitution states that the purpose of the Club is "to provide a forum for its members to read original papers, written solely by them, to an audience limited to the members of the Club and their guests." On its IRS Form 990, the Club describes its mission and "most important activities" as "a fellowship of men which meets and reads literary works written by members." Club members write and present papers to enhance their own skills and the skills of their

12

fellow Club members. That the Club only then makes some of those papers available to the public through the Museum Center differentiates it from the institutions in cases such as *Herb Soc. of Am.* and *Am. Humanist Assn.,* where the core activities of the institutions included actively spreading useful information to the public.

{¶36} The Club has failed to show that its core activities include the dissemination of useful information to benefit mankind, or to advance and benefit mankind in general or those in need of advancement in particular. We find that the BTA's determination that the Club is not a charitable institution was supported by reliable and probative evidence.

{¶37} Finally, under R.C. 5709.12(B), any institution, charitable or not, may qualify for a tax exemption if the property is "used exclusively for charitable purposes." All of the activities that the Club claims qualify it as an educational or charitable institution are conducted at the house in question.

{¶38} As discussed above, we find that the Club's activities do not qualify it as an educational or charitable institution. Those same activities form the basis of our analysis as to whether the house is used exclusively for charitable purposes. We find that the Club's activities at the house are not charitable in nature. Furthermore, the fact that the house is used in part for residential purposes as a cost-cutting measure militates against a finding that the property is used exclusively for charitable purposes. *See Cincinnati Community Kollel v. Testa,* 135 Ohio St.3d 219, 2013-Ohio-396, 985 N.E.2d 1236, at ¶ 27 ("Historically, * * * a distinctly residential use of real property has defeated a charitable-use exemption claim, even when the property is used at times for charitable purposes * * * this principle applies to R.C. 5709.12."); *John J. Schiff III Found., n.k.a. JJS3F Inc., d.b.a. Aneusole Glassworks*

*v. Testa*, BTA No. 2016-585, 2017 WL 1443963, *4-5 (April 14, 2017) (holding that the property in question was not tax exempt because it was used by the institution to save money by housing visiting artists and enticing potential employees with below-market housing).

**{¶39}** We find that the BTA's determination that the Club did not use the property exclusively for charitable purposes was supported by reliable and probative evidence. Thus, the house is not tax exempt under R.C. 5709.12(B).

**{¶40}** The Club has failed to show that it is clearly entitled to tax exemption under R.C. 5709.12 or 5709.121. *See Anderson/Maltbie Partnership*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, at ¶ 16. Thus, the BTA's decision was reasonable and lawful. The second assignment of error is overruled.

### *Third Assignment of Error*

**{¶41}** In its third assignment of error, the Club argues that the BTA's decision denied it equal protection under the law. The Club contends that the Commissioner and the BTA reached an unconstitutional result because of the disparity in the way it applied R.C. 5709.12 and 5709.121 to it and what it claims is a similarly situated entity, the Women Writing for a Change Foundation. The Commissioner responds that we lack jurisdiction to consider this issue because the Club did not raise an equal-protection issue in its notice of appeal to the BTA.

**{¶42}** R.C. 5717.02 governs the procedure of appeals of tax commissioner decisions to the BTA. It states that a "notice of appeal shall contain a short and plain statement of the claimed errors in the determination or redetermination of the tax commissioner * * *." R.C. 5717.02(C). The jurisdiction of the BTA is limited to errors specified in the notice of appeal. *Newman v. Levin*, 120 Ohio St.3d 127, 2008-

Ohio-5202, 896 N.E.2d 995, ¶ 26. In *Newman,* where the appellant never identified certain issues as errors in its notice of appeal to the BTA, the court held that the since the BTA lacked jurisdiction to consider those errors, the court lacked jurisdiction as well. *Id.* at ¶ 27-28.

{¶43} "The question of whether a tax statute is unconstitutional when applied to a particular state of facts must be raised in the notice of appeal to the Board of Tax Appeals * * *." *Cleveland Gear Co. v. Limbach*, 35 Ohio St.3d 229, 520 N.E.2d 188 (1988), paragraph three of the syllabus.

{¶44} The Club's notice of appeal to the BTA stated,

> The Tax Commissioner failed properly to interpret R.C. 5709.12 and 5709.121. Appellant is a non-profit IRC Section 501(c)(3) educational institution that utilizes the subject property for education and scientific purposes and is therefore exempt from taxation.

Although the Club did not raise the equal-protection issue in its notice of appeal, it nevertheless contends that its equal-protection claim is properly before this court because it presented evidence on the issue at the hearing before the BTA. The Club claims that the Commissioner objected only as to relevance and not on the failure to raise the equal-protection issue in the notice of appeal.[3] However, the fact that the BTA received some testimony and evidence on the equal-protection claim does not mean that the issue is properly before this court. *See Newman,* 120 Ohio St.3d 127, 2008-Ohio-5202, 896 N.E.2d 995, at ¶ 25-27 (holding that the BTA and the court of appeals lack jurisdiction to consider an issue not specified in the notice of appeal to

---

[3] We note that the only evidence submitted by the Club in support of its equal-protection claim is that the Women Writing for Change Foundation received a tax exemption because it was being used as a "community outreach center." There was no evidence presented as to how the foundation operates, what kind of classes it offers, if any, whether classes or seminars are open to the public, or whether it employs faculty.

the BTA even though the issue was argued before the BTA). Because the Club did not raise the equal-protection issue in its notice of appeal to the BTA, we lack jurisdiction to consider its third assignment of error. *See Newman* at ¶ 27.

### *Conclusion*

{¶45} For the reasons discussed above, we overrule the Club's first and second assignments of error, and we lack jurisdiction to consider its third assignment of error. We affirm the decision of the BTA.

Judgment affirmed.

**MOCK, P.J.,** and **ZAYAS, J.,** concur.


Please note:

The court has recorded its own entry on the date of the release of this opinion.