[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Rural Health Collaborative of S. Ohio, Inc. v. Testa,* Slip Opinion No. 2016-Ohio-508.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-508

RURAL HEALTH COLLABORATIVE OF SOUTHERN OHIO, INC., APPELLEE, *v.* TESTA, TAX COMMR., APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Rural Health Collaborative of S. Ohio, Inc. v. Testa,* Slip Opinion No. 2016-Ohio-508.]

*Taxation—Charitable-use exemption of real property from taxation—Board of Tax Appeals' finding that property owner qualified as charitable institution was reasonable and lawful—Board's grant of exemption under R.C. 5709.121(A) was premature in absence of full analysis of claim under R.C. 5709.121(A)(1)—Grant of exemption vacated and cause remanded for further proceedings.*

(No. 2014-0963—Submitted November 17, 2015—Decided February 16, 2016.)

APPEAL from the Board of Tax Appeals, No. 2012-3421.

_____

**Per Curiam.**

{¶ 1} This is an appeal by the tax commissioner from a decision of the Board of Tax Appeals ("BTA"), which granted a charitable-use exemption to a facility in Adams County that provides dialysis services. The property is owned by appellee, Rural Health Collaborative of Southern Ohio, Inc. ("Rural Health"), and operated under lease by Dialysis Clinic, Inc. Rural Health applied for the exemption, which the tax commissioner denied, relying primarily on this court's holding in *Dialysis Clinic, Inc. v. Levin*, 127 Ohio St.3d 215, 2010-Ohio-5071, 938 N.E.2d 329. The BTA reversed, concluding that the property qualified under R.C. 5709.121(A)(2) because Rural Health itself qualified as a charitable institution.

{¶ 2} On appeal, the tax commissioner argues both that Rural Health does not qualify as a charitable institution and that the *Dialysis Clinic* decision precludes exemption under the standards set forth in R.C. 5709.121. We conclude that the BTA's finding that Rural Health is a charitable institution is both reasonable and lawful, and we therefore affirm the finding. But we hold that the BTA's grant of exemption under R.C. 5709.121 was premature, because the BTA did not fully analyze the claim under R.C. 5709.121(A)(1). We therefore vacate the BTA's grant of exemption, and we remand for further proceedings consistent with this opinion.

### FACTUAL BACKGROUND

*The property at issue*

{¶ 3} The property at issue is two acres, improved with a one-story brick building, located in the Ohio Valley Local School District in Seaman in Adams County. The land was donated, and the building was constructed with funds that Rural Health received through a federal grant.

*The owner: Rural Health Collaborative of Southern Ohio, Inc.*

{¶ 4} At the time it was formed in 2001, Rural Health had four directors. The members were three nonprofit county hospitals for Adams, Brown, and Highland counties—Brown later withdrew when it became a for-profit hospital—

plus a nonprofit organization that provides physicians to underserved areas throughout Ohio. Rural Health's purposes focus on promoting health-care initiatives in southern Ohio. Rural Health has no staff; its directors and the staff of the members carry out Rural Health's activities.

{¶ 5} Rural Health's directors discuss medical needs in the region from the perspective of the member institutions and apply for grants to supply services without charge. Grant-funded programs that Rural Health has conducted include a tobacco-cessation program, a women-and-children-uninsured program focusing on pregnancy care, a diabetic-education program, and a managed-care grant used to assess the impact of managed care on providers. Blood drives are another activity organized by Rural Health. As of the time of the BTA hearing, none of the grant-supported programs was still being implemented.

{¶ 6} One need identified early by the board of directors was for more convenient dialysis services than the member institutions were able to provide. In particular, reducing travel times was important because patients feel increasingly ill on their way to dialysis treatments, which they must undergo every two to three days. Also, the treatments, which last three to four hours, leave patients feeling exhausted.

{¶ 7} To address this need, Rural Health resolved to establish a dialysis clinic; it received the donation of land, obtained a grant to construct the building, and identified Dialysis Clinic, Inc. ("DCI"), as the provider of dialysis services to operate the clinic.

*The lease agreement*

{¶ 8} Rural Health and DCI entered into a contract entitled "commercial lease agreement" on August 30, 2005. The agreement assigned maintenance and repair duties to Rural Health as landlord, required that utility payments be made by DCI as tenant, and created a mutual liability-insurance obligation. The original lease term ran for five years beginning July 1, 2005; an addendum provided for a

new five-year term running from 2010 to 2015. The rent was initially set for three years at $53,556 annually, payable in monthly installments. In the fourth year, the annual rent increased to $71,412, with subsequent increases at three-year intervals based on the Consumer Price Index. In 2012, however, the parties adjusted the lease to postpone rent escalations after DCI incurred operating losses at the site.

*The evidence regarding the charitable nature of DCI and the property use*

**{¶ 9}** According to DCI's indigency policy, the dialysis treatments it provides are "not a charity or gift to patients. DCI retains all rights to refuse to admit and treat a patient who has no ability to pay." But the testimony presented at the BTA hearing establishes a larger context for understanding this provision.

**{¶ 10}** DCI's general counsel testified that for Medicare patients, federal regulations generally required DCI to demand and seek to collect the 20 percent portion that is the patient's responsibility. He added that federal statutes specifically prohibit DCI from waiving the co-insurance.

**{¶ 11}** In light of the strict Medicare regulations, DCI's indigency policy was designed to avoid putting the patient through the collection process. The administrator of the Seaman clinic testified that Medicare would "allow us to write those [unpaid amounts] off" under one of two circumstances: if the clinic "[went] through a reasonable collection process," or if, alternatively, the clinic made "a fair determination" that the patient was unable to pay.

**{¶ 12}** When asked about the anticharity language of the indigency policy, DCI's general counsel explained that the point of the language was to convey that DCI could not provide Medicare patients with charity "in th[e] traditional sense"— i.e., it could not simply accept Medicare payment and waive copays. Reserving the right to refuse treatment is "part of [DCI's] financial stewardship," in that DCI must "make it clear that we may have to have some analysis for each patient." The policy thereby serves in part as a means by which the facility is able to procure the patient's cooperation in certifying his or her need.

{¶ 13} DCI's general counsel also testified that the indigency policy reached beyond the Medicare patients because "there's so many concepts in Medicare that talk about nondiscrimination between payor sources * * * [that] we decided that it was only fair" to apply the policy "to any patient that has a patient responsibility balance and that might need assistance." DCI encourages uninsured patients to apply for Medicaid; they typically qualify, at least for certain periods of time. When asked whether "DCI limit[s] services to patients for which [it is] fully compensated for those services," the general counsel answered: "No."

{¶ 14} Similarly, when asked whether he was aware of any instance where a patient had been refused service for the inability to pay for treatment, DCI's clinic administrator, answered: "No." He later reiterated: "At neither clinic, neither at Seaman nor Portsmouth, we've never turned a patient away due to inability to pay." The administrator elaborated that that was part of DCI's mission and corporate culture: "I've worked in health care for over 25 years and I've worked with hospitals and other health care organizations, * * * and I've never seen a company that walks the talk as far as providing services for all patients as DCI has."

{¶ 15} Testimony and documentation show that in each fiscal year from 2006 until the BTA hearing, operations at the Seaman clinic experienced a loss because expenses exceeded the revenues generated by the dialysis treatments.

### PROCEDURAL HISTORY

{¶ 16} Rural Health filed its exemption application on October 13, 2006, and the tax commissioner issued a final determination on June 20, 2012. Relying on *Dialysis Clinic, Inc. v. Levin*, 127 Ohio St.3d 215, 2010-Ohio-5071, 938 N.E.2d 329, the commissioner denied the exemption based on the reservation of the right to refuse treatment for inability to pay set forth in DCI's indigency policy. Rural Health appealed to the BTA, which held a hearing on February 4 and March 6, 2014, at which Rural Health presented the testimony of six witnesses and numerous exhibits.

**{¶ 17}** The BTA issued its decision on May 8, 2014. It conducted its analysis under R.C. 5709.121(A)(2), which deems property to be used exclusively for charitable purposes if it is owned by a charitable institution and made available under the institution's direction and control in furtherance of or incidental to the institution's charitable purposes, and not with a view to profit. After discussing the *Dialysis Clinic* case, the BTA found that in contrast to the earlier case, "the focus in this matter is whether [Rural Health] is a charitable institution, not DCI." BTA No. 2012-3421, 2014 WL 2809179, *3 (May 8, 2014). The BTA therefore found that Rural Health qualified as a charitable institution. *Id.*

**{¶ 18}** The BTA then turned to the question whether the subject property is "made available under the direction or control of such institution * * * for use in furtherance of or incidental to its charitable * * * purposes and not with a view to profit." R.C. 5709.121(A)(2). From *Cincinnati Community Kollel v. Testa*, 135 Ohio St.3d 219, 2013-Ohio-396, 985 N.E.2d 1236, the BTA extracted the principle that " 'the focus of the inquiry should be on the relationship between the actual use of the property and the purpose of the institution.' " 2014 WL 2809179 at *3, quoting *Cincinnati Community Kollel* at ¶ 28 (concerning question "whether an educational institution uses its property in furtherance of or incidental to its educational purposes" within the meaning of R.C. 5709.121(A)(2)). Applying that principle to this case, the BTA concluded that the Seaman clinic was operated in furtherance of charitable purposes. No separate analysis was performed as to whether Rural Health exercised direction or control over the use of the property. Finally, the BTA determined that the property was not used with a view to profit and therefore granted the exemption pursuant to 5709.121(A)(2). *Id.* at *4-5.

### THE TAX COMMISSIONER'S PROPOSITIONS OF LAW

**{¶ 19}** In his appeal from the BTA's decision, the tax commissioner presents the following three propositions of law:

1. Under *Dialysis Clinic v. Levin*, real property is not entitled to charitable exemption where it is used by a non-charitable institution such as Dialysis Clinic, Inc. to provide non-charitable dialysis care pursuant to an indigence policy that discriminates against those who cannot pay.

2. A property owner is not a charitable institution and exemption is defeated under R.C. 5709.121 where the owner's only longstanding activity is leasing property to a health care provider and the owner does not itself provide health care services.

3. To qualify *leased* property for charitable exemption pursuant to R.C. 5709.121, the property must be leased to and from a "charitable institution" in accordance with division (A)(1) of R.C. 5709.121, not the mutually exclusive division (A)(2). Further, leased property qualifies for charitable exemption only if it satisfies a strict standard for "exclusive charitable use."

### ANALYSIS

{¶ 20} R.C. 5709.12(B) states that "[r]eal * * * property * * * belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation." Traditionally, qualifying for the charitable-use exemption required the property owner to be using the property for the designated purposes—i.e., no matter how charitable the use otherwise appeared to be, a lease would destroy the possibility of obtaining the exemption, because the user of the property under the lease would not be the owner. *See First Baptist Church of Milford, Inc. v. Wilkins*, 110 Ohio St.3d 496, 2006-Ohio-4966, 854 N.E.2d 494, ¶ 12, citing *Lincoln Mem. Hosp., Inc. v. Warren*, 13 Ohio St.2d 109, 110, 235 N.E.2d 129 (1968).

{¶ 21} Against that background, the General Assembly enacted R.C. 5709.121 in 1969. Am.Sub.H.B. No. 817, 133 Ohio Laws, Part III, 2646-2647. In

his concurring opinion in *White Cross Hosp. Assn. v. Bd. of Tax Appeals*, 38 Ohio St.2d 199, 203, 311 N.E.2d 862 (1974), Justice Stern pronounced his oft-cited view that "the overall purpose of R.C. 5709.121 is to declare that the ownership and use of property need not coincide for that property to be tax exempt." That this appeal involves leased property is not in dispute; accordingly, the path to a charitable-use exemption (if there is one) lies through R.C. 5709.121. It is also a point of distinction from *Dialysis Clinic*, 127 Ohio St.3d 215, 2010-Ohio-5071, 938 N.E.2d 329, on which the tax commissioner relies: there was no lease in *Dialysis Clinic*. *See id.* at ¶ 4.

{¶ 22} R.C. 5709.121 allows for two possible avenues to a charitable-use exemption in this case:

> (A)     Real property * * * belonging to a charitable * * * institution * * * shall be considered as used exclusively for charitable * * * purposes by such institution * * * if it meets one of the following requirements:
>
> (1)     It is used by such institution * * * or by one or more other such institutions * * * under a lease, sublease, or other contractual arrangement:
>
> (a)      * * *
>
> (b)      For * * * charitable * * * purposes.
>
> (2)      It is made available under the direction or control of such institution * * * for use in furtherance of or incidental to its charitable * * * purposes and not with the view to profit.

8

*The BTA did not abuse its discretion in determining that Rural Health qualifies as a charitable institution*

{¶ 23} In support of his second proposition of law, the tax commissioner challenges the BTA's finding that Rural Health qualifies as a charitable institution. The determination whether a property owner qualifies as a charitable institution under R.C. 5709.121 requires examination of the "core activity" of the institution and determining whether that activity qualifies as charitable for property-tax purposes. *Dialysis Clinic*, 127 Ohio St.3d 215, 2010-Ohio-5071, 938 N.E.2d 329, at ¶ 28-30 (rejecting the contention that the tax-exempt status of the applicant under Section 501(c)(3) of the Internal Revenue Code automatically established its character as a charitable institution for property-tax purposes); *see also OCLC Online Computer Library Ctr., Inc. v. Kinney*, 11 Ohio St.3d 198, 201, 464 N.E.2d 572 (1984).

{¶ 24} Also pertinent in this context is the standard of review that we apply to the determinations of the BTA. Although we have not explicitly so stated, we have in past decisions treated whether an applicant qualifies as a charitable institution as primarily an issue of fact, the determination of which lies within the province of the taxing authorities and thus merits our deference. *See Dialysis Clinic* at ¶ 31-35 (affirming BTA's determination of charitable status based on its being "reasonable and lawful"); *Northeast Ohio Psych. Inst. v. Levin*, 121 Ohio St.3d 292, 2009-Ohio-583, 903 N.E.2d 1188, ¶ 20 (same); *OCLC* (same). We approach the BTA's determination at issue here in the same spirit of deference. *See EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 9, 14 (BTA's weighing of evidence and determination of credibility of witnesses reviewed under abuse-of-discretion standard).

{¶ 25} Here the record shows that Rural Health is an organization serving as an instrumentality of three nonprofit institutions in the region. The BTA noted the circumstances of Rural Health's formation and its work in obtaining grants for

tobacco-cessation funding, pregnancy care and education, diabetes prevention and education, and managed-care planning, along with community-care initiatives such as blood drives. BTA No. 2012-3421, 2014 WL 2809179, at *3. The BTA viewed the construction and leasing of the dialysis clinic within the context of that larger body of activities, and we conclude that its determination in this regard is both reasonable and lawful.

{¶ 26} Seeking reversal of the BTA's finding, the tax commissioner asserts as controlling our decision in *Northeast Ohio*, in which we affirmed the BTA's denial of exemption based on its determination that Northeast Ohio Psychiatric Institute, the lessor of a building to a charitable provider of psychiatric services, could not qualify as a charitable institution. In that case, the record demonstrated that Northeast Ohio was landlord to both for-profit and charitable lessees and provided staffing services to the lessees as well. *Northeast Ohio Psychiatric Institute v. Wilkins*, BTA No. 2005-M-1683, 2007 WL 4463267, *4 (Dec. 14, 2007). Based on the entire record before it, the BTA found that although Northeast Ohio was a nonprofit corporation, its "activities are more akin to commercial, income-producing activities." *Id.* On appeal, we rejected Northeast Ohio's argument that it qualified as a charitable institution as to its lease with the provider. We insisted that the standard for Northeast Ohio's qualification for the exemption was "based on the range of *its own activities*" rather than those of a single one of its lessees for whose premises it sought a split-listed exemption. (Emphasis sic.) *Northeast Ohio*, 121 Ohio St.3d 292, 2009-Ohio-583, 903 N.E.2d 1188, at ¶ 14, citing *OCLC*, 11 Ohio St.3d at 201, 464 N.E.2d 572.

{¶ 27} As is evident from the foregoing discussion, *Northeast Ohio* does not militate against Rural Health's qualifying as a charitable institution in this case. The facts of *Northeast Ohio* differ from those here. In this case, the BTA did consider the "range of [Rural Health's] own activities" and concluded that the entity did qualify as a charitable institution.

10

**{¶ 28}** The tax commissioner attacks on several other factual grounds the BTA's finding that Rural Health is a charitable institution within the meaning of R.C. 5709.121. But the commissioner fails to show that the BTA abused its fact-finding discretion. Specifically:

- Whereas the BTA looked at a range of activities facilitated by Rural Health that were "made available to the community at large without charge," BTA No. 2012-3421, 2014 WL 2809179, at *3, the commissioner asserts that leasing to DCI is Rural Health's "core activity." We see no reason to disturb the BTA's determination of Rural Health's core activities.

- The commissioner emphasizes that the DCI lease is a market-rate lease. But unlike the property owner in *Northeast Ohio*, which engaged in leasing and staffing services that generated revenue, *see id.* at ¶ 15, Rural Health was found to engage in a range of charitable activities. The fact that the DCI lease generates revenue for Rural Health does not by itself destroy Rural Heath's status as a charitable institution. *See Girl Scouts-Great Trail Council v. Levin*, 113 Ohio St.3d 24, 2007-Ohio-972, 862 N.E.2d 493, ¶ 17; *Community Health Professionals, Inc. v. Levin*, 113 Ohio St.3d 432, 2007-Ohio-2336, 866 N.E.2d 478, ¶ 23.

- The commissioner points out that Rural Health has no employees of its own and that it uses the employees of its member institutions. We are not persuaded, however, that as a matter of law this factor undermines the finding that Rural Health qualifies as a charitable institution.

- The commissioner notes that various activities coordinated by Rural Health at meetings or in communications are actually conducted by the member hospitals. But determining whether the coordination itself

constitutes an activity is a factual determination within the province of the BTA.

*Rural Health does not exercise "direction and control" within the meaning of R.C. 5709.121(A)(2)*

**{¶ 29}** In support of his third proposition of law, the tax commissioner argues that R.C. 5709.121(A)(1) applies to the exclusion of R.C. 5709.121(A)(2). The commissioner offers two forms of this argument. First, the commissioner contends that only division (A)(1) applies in this case because it expressly refers to those situations in which there is an actual lease. In the alternative, the commissioner contends that the existence of DCI's lease and other circumstances preclude the finding that Rural Health exercises "direction and control" over the use of the property, which is an element that division (A)(2) explicitly requires.

**{¶ 30}** Our review of the case law leads us to reject the first form of the tax commissioner's argument. As Rural Health points out, we have acknowledged that lease-like contractual arrangements can constitute one way that property is "made available" under division (A)(2). *See Case W. Res. Univ. v. Wilkins*, 105 Ohio St.3d 276, 2005-Ohio-1649, 825 N.E.2d 146, ¶ 30 (memorandum of understanding between university and fraternity by which the latter had "exclusive use" of a house to supply residence to fraternity members satisfied the "made available" element of division (A)(2)); *Community Health Professionals* at ¶ 19-20 (tax commissioner conceded that property leased by one affiliated nonprofit to the other affiliates was made available "under direction or control" of the lessor). While he points to reasons why these cases do not definitively establish the point, the tax commissioner cannot avoid his longstanding acceptance of leasing situations as satisfying the "made available" standard. *See also Humane Soc. Found. of Hancock Cty. v. Tracy*, BTA No. 98-J-884, 1999 Ohio Tax LEXIS 1552, 4 (Oct. 15, 1999) (charitable entity leasing kennel to other charitable entity concededly satisfied the "made available under direction and control" requirement of division (A)(2)).

{¶ 31} On the other hand, our review of the record and the BTA decision persuade us that the alternative form of the argument raised in support of the tax commissioner's third proposition of law is correct. Ordinarily, by granting exclusive possessory rights to the lessee, a lease will defeat a claim that the lessor/owner is exercising "direction and control" over activities on the premises, an explicit condition for R.C. 5709.121(A)(2) to apply. On this record, there is no indication that Rural Health exercises any authority over the provision of dialysis services; DCI is in that business and conducts that operation on the premises.

{¶ 32} In purporting to apply R.C. 5709.121(A)(2), the BTA skipped over the "direction and control" requirement completely, plunging ahead to consider whether the provision of dialysis was "in furtherance of or incidental to" Rural Health's purposes. Given the absence of any evidence that could support a finding of direction and control by Rural Health, the BTA erred in granting the exemption under the authority of R.C. 5709.121(A)(2).

*On remand, the BTA should complete the analysis under R.C. 5709.121(A)(1)*

{¶ 33} Reversing the grant of exemption based on R.C. 5709.121(A)(2) does not mean, however, that we must conclude that the exemption claim should be denied. That ruling would be premature because the BTA did not fully consider the claim under R.C. 5709.121(A)(1).

{¶ 34} Under division (A)(1), there are two remaining and closely related elements to be considered on remand: whether DCI as lessee can qualify as a charitable institution, since both parties to a lease must so qualify under division (A)(1), and whether DCI's provision of services on site qualifies as charitable. On remand, the BTA should consider both of these elements using the standard for exemption set forth in *Vick v. Cleveland Mem. Med. Found.*, 2 Ohio St.2d 30, 206 N.E.2d 2 (1965), paragraph two of the syllabus—i.e., whether DCI is "providing services to those in need, without regard to race, creed, color or ability to pay."

**{¶ 35}** To be sure, the tax commissioner contends in support of his first proposition of law that our decision in *Dialysis Clinic*, 127 Ohio St.3d 215, 2010-Ohio-5071, 938 N.E.2d 329, bars a finding in Rural Health's favor. We now turn to that contention.

*Our decision in* Dialysis Clinic *is not controlling precedent here*

**{¶ 36}** The tax commissioner contends that Rural Health cannot prevail when R.C. 5709.121(A)(1) is applied in this case, because this court previously determined in *Dialysis Clinic* that DCI does not qualify as a charitable institution. The commissioner notes that in *Dialysis Clinic*, this court quoted and relied in part on the language of the same indigency policy in its decision affirming the BTA's denial of the exemption. *Id.* at ¶ 34-35. Under the tax commissioner's theory, *Dialysis Clinic* is controlling precedent, particularly on the question whether DCI qualifies as a charitable institution. We conclude that the commissioner's claim of controlling precedent is mistaken.

**{¶ 37}** As an initial point, the tax commissioner explicitly disclaims reliance on collateral estoppel. It follows that whatever the merits of a claim of collateral estoppel here, that claim has been waived.

**{¶ 38}** Instead, the tax commissioner appears to invoke the doctrine of stare decisis, according to which courts follow "controlling precedent, thus creating stability and predictability in our legal system." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 1. But stare decisis typically applies to principles of law, not findings of fact. *State v. Bethel*, 10th Dist. Franklin No. 07AP-810, 2008-Ohio-2697, ¶ 26 ("Stare decisis has two aspects: (1) that in the absence of overriding considerations courts will adhere to its [sic] own previously announced principles of law; and (2) that courts are bound by and must follow decisions of a reviewing court that has decided the same issue"); *Terrell v. Williams*, 10th Dist. Franklin No. 79AP-16, 1979 WL 209087, *2 (May 24, 1979)

14

(stare decisis is "based upon following controlling legal principals [sic] from former judgments," and is "not applicable where the prior case decided factual matters").

{¶ 39} In *Dialysis Clinic*, the BTA had determined *as a matter of fact* that DCI did not constitute a charitable institution, and this court affirmed because that finding was reasonable, lawful, and supported by evidence. *Id.* at ¶ 30 ("we must determine whether the BTA acted reasonably and lawfully when it found the DCI did not qualify as a charitable institution"), ¶ 34 ("We are not persuaded * * * that [other evidence indicating charitable purpose] required the BTA to find that DCI satisfied the nondiscrimination requirement, given that DCI's own policy statement explicitly reserved the right to refuse to treat indigent patients").

{¶ 40} Because this court's ruling in *Dialysis Clinic* merely affirmed the BTA's finding of fact, the BTA was free to evaluate the evidence in the present case and make a fresh determination whether DCI could qualify as a charitable institution for purposes of 5709.121(A)(1). Stare decisis did not bind the BTA to the conclusion that it had drawn in the earlier case, in which it was presented with a different record developed by a different exemption applicant.

## CONCLUSION

{¶ 41} For the foregoing reasons, we affirm the BTA's finding that Rural Health qualified as a charitable institution under R.C. 5709.121(A), but we reverse the BTA's finding that the property qualified for a charitable-use exemption under R.C. 5709.121(A)(2). Additionally, we vacate the BTA's decision and remand for consideration whether the property qualifies under the remaining criteria of R.C. 5709.121(A)(1).

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LANZINGER, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL and KENNEDY, JJ., dissent.

_____

15

**O'DONNELL, J., dissenting.**

{¶ 42} Respectfully, I dissent.

{¶ 43} In my view, our decision in *Dialysis Clinic, Inc. v. Levin*, 127 Ohio St.3d 215, 2010-Ohio-5071, 938 N.E.2d 329, is a controlling precedent as argued by the tax commissioner, and on that basis I would reverse the decision of the BTA.

KENNEDY, J., concurs in the foregoing opinion.

_____

Bricker & Eckler, L.L.P., and Mark A. Engel, for appellee.

Michael DeWine, Attorney General, and David D. Ebersole and Barton A. Hubbard, Assistant Attorneys General, for appellant.

_____