[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Jefferson Industries Corp. v. Madison Cty. Bd. of Revision,* Slip Opinion No. 2016-Ohio-7089.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-7089

JEFFERSON INDUSTRIES CORPORATION, APPELLANT, *v.* MADISON COUNTY
BOARD OF REVISION ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it
may be cited as *Jefferson Industries Corp. v. Madison Cty. Bd. of Revision,*
Slip Opinion No. 2016-Ohio-7089.]**

*Taxation—Real-property valuation—BTA must address potentially material
conflicts in evidence before adopting appraiser's opinion of value—
Decision vacated and cause remanded.*

(No. 2014-1594—Submitted June 14, 2016—Decided October 4, 2016.)

APPEAL from the Board of Tax Appeals, No. 2012-3624.

————————————

**Per Curiam.**

{¶ 1} This real-property-valuation case concerns the proper valuation for
tax year 2011 of a plant involved in manufacturing and stamping car frames for
Honda. The Madison County Auditor valued the property at approximately
$34,500,000. Owner and appellant, Jefferson Industries Corporation, filed a

complaint challenging this valuation with the Madison County Board of Revision ("BOR") and offered its own appraisal. After considering the additional information, the BOR adjusted its valuation to $28,000,000. Jefferson Industries appealed to the Board of Tax Appeals ("BTA"), offering its appraisal valuation of $10,420,000. Before the BTA, appellee Jefferson Local School District Board of Education ("BOE") argued for retention of the $28,000,000 valuation. The BTA agreed with the BOR's value, primarily on the basis of the BOE's appraisal. Jefferson Industries has again appealed.

{¶ 2} Although we defer to the BTA's broad discretion to determine the probative force of appraisal evidence, we also insist that the BTA explicitly address important evidentiary conflicts so that we may determine on appeal whether the BTA's decision is reasonable and lawful. In this opinion, we will address certain points that were the subject of specific discussion by the BTA, and we will also identify certain points that the BTA did not address but should have. We vacate the decision of the BTA and remand the case to afford the BTA the opportunity to address particular objections to the BOE's appraisal that the board did not resolve.

## FACTUAL BACKGROUND

{¶ 3} The property consists of three parcels amounting to approximately 81 acres. As of 2011, the tax year in question, the land had been improved with about 685,000 square feet of manufacturing, warehouse, and office space. The improvements were constructed in 11 increments from 1988 through 2010, with the two largest increments being the original 159,800 square feet in 1988 and 104,800 square feet in 2007.

{¶ 4} An earlier valuation case involving this property furnishes the backdrop for this appeal. Jefferson Industries had sought relief from the assessment for tax year 2004, when the auditor had valued the facility at $23,308,690 and the BOR had ordered a reduction to $20,650,000. Jefferson Industries claimed a value of $12,250,000, relying on an appraisal from David Hatcher, MAI (Member of the

2

Appraisal Institute); the BOE presented an appraisal report from Robert Weiler, MAI, and G. Franklin Hinkle II, MAI, opining a value of $19,750,000. The BTA adopted the BOE's appraisal valuation, explaining that it agreed that Hinkle had properly categorized the property as "heavy manufacturing," as opposed to the "light industrial" characterization of Hatcher. *Jefferson Industries Corp. v. Madison Cty. Bd. of Revision*, BTA No. 2005-M-1525, 2007 WL 1946465, at *3, 5 (June 22, 2007).

{¶ 5} In this case, the auditor assigned a true value of $34,504,964 to the property for 2011, and Jefferson Industries filed a complaint seeking a reduction to $18,196,400. The BOE filed a countercomplaint seeking retention of the auditor's valuation. The BOR held a hearing on July 24, 2012, at which Jefferson Industries, through counsel, presented the appraisal report and testimony of Ronald M. Eberly Jr., MAI, who opined a value of $10,420,000.

{¶ 6} In its deliberation, the BOR referred to a consultation with an unidentified appraiser hired by the county, who had concluded that the auditor's value was about 20 percent too high. The BOR set the true value at $41 per square foot, or $28,000,000—a value that is, consistent with the consultant's advice, 81 percent of the auditor's valuation. Jefferson Industries appealed to the BTA.

{¶ 7} At the BTA hearing, the BOE presented the appraisal report and testimony of Hinkle, who had determined a value of $28,000,000, thereby supporting the BOR's decision. Additionally, the Madison County auditor testified that the BOR had considered the Jefferson Industries appraisal and five comparable sales provided by an appraisal firm. For Jefferson Industries, Eberly testified that three of the comparables had not been offered on the open market and that the property uses were not comparable. Eberly also offered specific criticisms of the Hinkle appraisal.

{¶ 8} The BTA issued its decision on August 15, 2014, noting that it had previously issued a decision on the same points regarding the 2004 tax year. The

BTA stood by its analysis regarding the heavy-manufacturing issue, as well as its distinction between real and personal property, and adopted $28,000,000 as the property's true value. BTA No. 2012-3624, 2014 Ohio Tax LEXIS 3856 (Aug. 15, 2014). On the personal-property issue, the BTA quoted its earlier decision:

> Thus, the argument goes, even though the subject property has installed deeper concrete foundations under certain machinery, the value of the thicker floor cannot be considered in this matter. There has been no substantiation, other than testimony, as to the manner in which the foundations are taxed. Moreover, under the principle of substitution, while the foundation is taxed as personalty, its utility to a subsequent purchaser may add value. In other words, a subsequent purchaser may take into consideration that it would not have to fortify a floor for heavy machinery in the subject, while it would have to make such alterations in a competing property.

*Jefferson Industries Corp. v. Madison Cty. Bd. of Revision*, BTA No. 2012-3624, 2014 Ohio Tax LEXIS 3856, 4-5, quoting *Jefferson Industries Corp.*, BTA No. 2005-M-1525, 2007 WL 1946465 at *5, fn. 1.

### THE COMPETING APPRAISAL EVIDENCE

{¶ 9} The BOE and Jefferson Industries appraisers approached the valuation process differently. Eberly first valued the land using a land-sale comparison method, arriving at a value of $2,250,000 for the land. With respect to improvements, Eberly developed a "weighted chronological age" of 11 years for the facility as a whole, given that it had been built in increments over a 22-year period. He next performed a cost approach using Marshall Valuation Service ("Marshall") for cost figures and generated depreciation of 71 percent by the

4

market-extraction method, which relies on comparables; his cost approach led to a value of $11,630,000 once improvement cost was added to land value.

{¶ 10} Eberly's sales-comparison approach relied on five comparables within Ohio. Eberly consulted other brokers about potential sale price, made adjustments for curing deficiencies in the current plant and for its functional detriments, and concluded that $15.25 per square foot was appropriate, which generated a value of $10,420,000.

{¶ 11} In his reconciliation, Eberly noted that the cost approach was primarily a cross check against the sales-comparison approach, which "does not reflect the actions of market participants and is therefore given secondary weight," with primary weight accorded to the sales-comparison approach. Thus, Eberly adopted the result from the latter approach, which he understood to be corroborated by the former: the value of the property as of January 1, 2011, was $10,420,000.

{¶ 12} Eberly put the manufacturing portion of the Jefferson Industries facility at 553,575 square feet while Hinkle put it at 585,000 square feet. Hinkle distinguished the heavy-manufacturing area at 150,640 square feet from the light-manufacturing area at 434,360 square feet.

{¶ 13} Hinkle performed a cost approach by first determining a land valuation of $2,450,000 (as opposed to Eberly's $2,250,000). Hinkle's Marshall-derived figure for the heavy-manufacturing space was valued at $93.76 per square foot, with values of $41.50 for the light-manufacturing area and $40.37 for the warehouse and shipping area. The blended price per square foot was $52.83. Once special adjustments were made, the figure was $72.63 per square foot.

{¶ 14} Hinkle's use of the Marshall cost schedules contrasted sharply with Eberly's. Eberly's overall cost per square foot was $40.74, the lower amount traceable in part to the adjusted cost of $37.23 per square foot for the manufacturing/warehouse area and $59.95 for the office area, as opposed to the higher figures used by Hinkle. Hinkle also used a lower depreciation factor, 55

percent, derived primarily by the economic-age-life method, which is determined by assessing the amount of wear and tear on a building. Hinkle's cost approach figure was $28,000,000, as opposed to Eberly's $11,630,000.

{¶ 15} Hinkle's sales-comparison approach relied on four widely dispersed comparables, three of them out of state.[1] Hinkle, unlike Eberly, was seeking facilities with a heavy-manufacturing component. Hinkle made adjustments and concluded a value in the $27,400,000 to $28,770,000 range.

{¶ 16} At the BTA hearing, Eberly testified that under Marshall, the Jefferson plant did not qualify as heavy manufacturing because both the cranes and the reinforced floors were independent of the plant structure and were therefore personal property.

{¶ 17} Hinkle testified on surrebuttal that the walls and floors had a reinforcement component because of the heavy pounding and vibrations caused by the round-the-clock stamping operations and were therefore part of the realty. Hinkle added that Eberly should not have used the market-extraction technique for depreciation because it was primarily an academic exercise not commonly used in the appraisal business.

---

[1] As Jefferson Industries points out, one of Hinkle's comparables had been rejected by the BTA in the 2004-tax-year case on the grounds that the building had been transferred as part of the sale of the business and the allocation to real property was uncertain. *See Jefferson Industries*, BTA No. 2005-M-1525, 2007 WL 1946465, *4. Before the BTA, Jefferson Industries did nothing to impugn the validity of the sale except to observe that it had been previously rejected. Given that no collateral-estoppel issue has been raised, the BTA was not legally constrained to disregard the sale. *Accord Rural Health Collaborative of S. Ohio, Inc. v. Testa*, 145 Ohio St.3d 430, 2016-Ohio-508, 50 N.E.3d 486, ¶ 39-40 (BTA not precluded from redetermining an issue of fact previously decided one way, based on the evidence presented in the current case).

### THE USE OF AND EMPHASIS UPON A COST APPROACH LAY WITHIN THE PROPER EXERCISE OF DISCRETION BY THE BTA

*1. The cost approach constitutes a valid component of determining the value of the property at issue*

**{¶ 18}** Jefferson Industries faults the BTA's decision for an alleged overreliance on the cost approach. We conclude that this objection lacks merit. First, the BTA adopted Hinkle's appraisal, which performed both a cost approach and a sales-comparison approach. The BTA specifically observed that Hinkle's cost approach was supported by his sales-comparison approach as a reason for adopting it. Second, a reliance on the cost approach would have placed the BTA in a position not substantially different from the more general selection of one appraisal over the other; Eberly's cost approach would have yielded a value of $11,600,000, if relied upon.

**{¶ 19}** More significantly, though, the emphasis on the cost approach cannot be said to be erroneous. It is certainly true that "[t]he cost approach usually works best for newer improvements, because construction costs are easier to estimate and there is less depreciation." International Association of Assessing Officers ("IAAO"), *Property Assessment Valuation* 127 (2d Ed.1996). Jefferson Industries argues that the age of the manufacturing facility here militates so strongly against relying on the cost approach that the BTA's reliance on it is unreasonable or unlawful. Jefferson Industries points out that the BTA's 2007 decision, which addressed the value of the property at issue for the tax year 2004, called into question any reliance on a cost approach because of the facility's age. BTA No. 2005-M-1525, 2007 WL 1946465, *5. Jefferson then asserts that there is "no basis for the conclusion that, seven years later, the cost approach is now somehow reliable."

**{¶ 20}** But that is wrong. The facility was built in increments over a 20-plus year period. While the initial 159,800 square feet of the current 683,415 square

feet were constructed in the 1988, Jefferson Industries added 104,800 square feet in 2007, with an additional 42,000 square feet added in 2008 and yet another 35,134 square feet added during 2010, the year leading up to the January 1, 2011 lien date. Indeed, more than 50 percent of the plant was less than six years old as of the lien date, and 63 percent of the facility was built within the last 10 years. Because nearly two-thirds of the facility had been constructed within ten years of the lien date, we find the age-of-improvements argument unpersuasive.

2. *There is no legal error in the BTA's endorsement of Hinkle's use of the "heavy industry" cost schedules*

{¶ 21} Jefferson Industries also launches a two-pronged challenge to the manner in which Hinkle performed his cost approach. First, Jefferson maintains that the use of the "heavy industry" portion of the cost schedules for part of the facility is mistaken. Second, Jefferson asserts that Hinkle's cost approach included tangible personal property that should have been subtracted from the real-property assessment.

{¶ 22} Although these arguments were appropriately addressed to the BTA as the finder of fact, the BTA rejected them, and we discern no legal error in that rejection. Eberly asserted reasons why the heavy manufacturing category could not be applied; Hinkle asserted reasons why it should be. The BTA made its determination.

{¶ 23} As for the alleged inclusion of personal property in the assessment value, the record does not furnish an adequate basis for identifying any item of property, or any component of the facility, whose classification as real or personal property is specifically at issue. Eberly's testimony indicated that foundational support structures for equipment used in heavy manufacturing constituted personal property and should not be part of the assessment. But the difference between his appraisal and Hinkle's appraisal on this score is not whether or not certain specifically identified structural components are included within, or excluded from,

the real property valuation. Rather, the issue is which cost-per-square-foot schedule should be used. Hinkle testified in surrebuttal that he had been told that the "walls and floors of the manufacturing area had a reinforcement component because of the heavy pounding and the vibrations that are caused by the stamping facilities." He used "heavy manufacturing" on that basis, and the BTA acted within its discretion as fact-finder in relying on his judgment.

## THE BTA FAILED TO ADDRESS CONFLICTING EVIDENCE REGARDING ASPECTS OF THE HINKLE APPRAISAL

**{¶ 24}** In this appeal, Jefferson Industries takes issue not only with what the BTA did find, but what it ignored; and what the board ignored in this case was not just an argument advanced by counsel below, but conflicting evidence. Where there is conflicting evidence, the BTA must address potentially material conflicts in the evidence before simply adopting an appraiser's opinion of value. *See Gen. Motors Corp. v. Cuyahoga Cty. Bd. of Revision,* 67 Ohio St.3d 310, 617 N.E.2d 1102 (1993); *Villa Park Ltd. v. Clark Cty. Bd. of Revision*, 68 Ohio St.3d 215, 218, 625 N.E.2d 613 (1994); *HealthSouth Corp. v. Levin*, 121 Ohio St.3d 282, 2009-Ohio-584, 903 N.E.2d 1179, ¶ 31-35; *compare Sears, Roebuck & Co. v. Franklin Cty. Bd. of Revision*, 144 Ohio St.3d 421, 2015-Ohio-4522, 44 N.E.3d 274, ¶ 18 (distinguishing cases where there are multiple appraisals and the BTA must "set forth sufficient reasons for its determination that would permit us to decide whether the board's valuation was reasonable and lawful" from those cases in which the BTA straightforwardly adopts the value from the only appraisal in the case).

**{¶ 25}** We identify several instances in which the BTA failed to properly address evidentiary conflicts.

1.  *Eberly's objections to Hinkle's cost approach need to be considered if*
    *Hinkle's appraisal is to be adopted*

    a.  Reproduction versus replacement cost

**{¶ 26}** Jefferson Industries points to Eberly's testimony in rebuttal to the Hinkle appraisal asserting that Hinkle misused the Marshall cost schedules and performed a reproduction-cost rather than the Ohio-law-mandated replacement-cost analysis.  *See* Ohio Adm.Code 5703-25-12(A) ("In the use of the cost approach to estimate improvement value the *replacement* cost new is first estimated." [emphasis added]).  As explained by the IAAO, "reproduction cost" is "the cost of producing an exact replica of a building or improvement using the same or very similar materials, design, and workmanship."  *Property Assessment Valuation* at 131; *see also* Appraisal Institute, *Appraisal of Real Estate* 569-570 (14th Ed.2013) (reproduction cost "embod[ies] all the deficiencies, superadequacies, and obsolescence of the subject improvements").  By contrast, "replacement cost" is "the cost of producing a building or improvement having the same utility, but using modern materials, design, and workmanship."  *Id.*; *see also Appraisal of Real Estate* at 570 (noting that in using replacement cost, "some existing obsolescence in the property may be cured").

**{¶ 27}** In essence, Jefferson Industries contends that Hinkle overstated these costs by assuming the construction of a replica rather than a similar building of the same utility at the least possible cost.  In two respects, Eberly gave testimony that furthers Jefferson Industries' reproduction-cost challenge.  First, Hinkle used the "average cost" figures from the relevant Marshall cost schedules rather than the "low cost" figures; Eberly suggested that Hinkle was thereby counting tangible personal property in the building as part of the building itself, thereby exaggerating true value.  Second, Hinkle added an increment of cost for air conditioning for the factory portion of the facility, which Eberly described as a "superadequacy."

b. Warehouse-space characterization

**{¶ 28}** Eberly also challenged the choice of cost schedule with respect to the warehouse space in the Jefferson Industries facility. Hinkle selected the "distribution warehouse" schedule rather than using the light-manufacturing schedule for that space.

c. Competing cost figures

**{¶ 29}** The starting point of estimated cost before the deduction of depreciation and obsolescence varies greatly between the two appraisals. Eberly's estimated cost figure, including soft costs, was $33,685,457; Hinkle's was $52,239,128. The gap called for the BTA to explicitly consider the objections to Hinkle's method before adopting it.

d. Obsolescence

**{¶ 30}** Eberly opined that there would have been external obsolescence for the Jefferson facility, but Hinkle opined that there was none. (Eberly's own external obsolescence constituted part of the depreciation that he extracted from the market through five comparables.) "External obsolescence" is defined as "loss in value as a result of an impairment in utility and desirability caused by factors external to the property * * * and is generally deemed to be incurable." *Property Assessment Valuation* at 155. Both appraisers agreed that in 2011, the Jefferson Industries plant had significant functional obsolescence, i.e. a loss of utility due to physical characteristics of the property such as "poor or inappropriate architecture, * * *, wasteful floor plans, inappropriate room sizes, inadequate heating or cooling capacity, and so on." *Id*. at 154-155. The main difference lay in whether general economic conditions should be deemed to have adversely affected the market for industrial properties.

**{¶ 31}** Eberly defended his market-extraction approach to depreciation and criticized the "straight line" approach used by Hinkle, inasmuch as manufacturing-facility depreciation occurs rapidly at first and then slows down. Given that Hinkle

used a depreciation percentage of 55 percent and Eberly used a depreciation percentage of 71 percent, the divergence was significant enough to require the BTA to consider Hinkle's computations before it adopted Hinkle's appraisal valuation.

{¶ 32} Consideration was also necessary in light of the dispute over the use of cost schedules in developing the replacement/reproduction cost; as the IAAO instructs, "[t]heoretically it does not matter which type of cost is used in estimating market value as long as accrued depreciation is measured correctly." *Property Assessment Valuation* at 131. Indeed, a proper allowance for functional obsolescence would subtract any excess cost amount associated with "superadequacies."

2. *The BTA should address Eberly's criticism of Hinkle's sale comparables*

{¶ 33} The BTA stated that it would adopt Hinkle's cost approach in part because it was "well supported by [Hinkle's] sales comparison approach." But in addition to differing from Eberly's sales-comparison approach, at the BTA hearing Eberly criticized specific features of Hinkle's appraisal.

• The first comparable was not a sale on the open market, and the price was an allocated sale price of the sale of the business (the same sale was rejected by the BTA for the 2004 tax year). Also, the grantee was lessee at the time of sale, indicating a relationship that may not qualify as one at arm's length; Eberly also testified that a leased fee sale usually does not indicate market value.

• The second comparable was also not an open-market sale, and here again, the tenant was the purchaser. Also, the property was a "high-end warehouse distribution facility" which in Eberly's opinion was not at all comparable to the subject property.

• The third comparable was an open-market sale, but was sold based on a capitalization rate as an investment.

- The fourth property was an open-market sale in which there was "unknown distress" on the part of the buyer because of a flooding situation; in other words, the sale may not have qualified as voluntary or at arm's length.

{¶ 34} The BTA pronounced Hinkle's sales-comparison approach strong support for his cost approach, without addressing Eberly's potentially substantial objections. Nor did Hinkle's rebuttal testimony address any of these points.

{¶ 35} Before adopting the Hinkle appraisal, caselaw requires the BTA to address these objections and make whatever disposition of it the BTA deems proper. Quite simply, as a reviewing court, "[w]e can perform our duty to affirm reasonable, and to reverse unreasonable, determinations only when the BTA sets forth its findings and the basis therefor." *Gen. Motors Corp. v. Cuyahoga Cty. Bd. of Revision*, 53 Ohio St.3d 233, 235, 559 N.E.2d 1328 (1990). Without the board's having explicitly addressed the evidentiary conflicts in the record, we cannot be sure that the BTA did not simply ignore the conflicting evidence; nor can we meaningfully determine whether the BTA's decision is reasonable and lawful.

### CONCLUSION

{¶ 36} For the foregoing reasons, we affirm the BTA's rulings regarding the use of the cost approach and the reliance on Hinkle's use of heavy-manufacturing schedules, and those findings shall be law of the case on remand. But for the reasons stated, we vacate the decision of the BTA, and we remand with instructions that the BTA reconsider the evidence in the light of the specific objections, enumerated in this opinion, that were raised to Hinkle's appraisal but were not addressed by the BTA. If the BTA remains convinced that it should adopt Hinkle's appraisal, it should do so, stating why the objections do not persuade it otherwise. Alternatively, the BTA may re-evaluate the evidence in the light of the established law of the case, as well as in light of the objections, and perform an independent valuation of the property.

Decision vacated

and cause remanded.

O'CONNOR, C.J., and PFEIFER, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL, J., dissents, and would affirm decision of the Board of Tax Appeals.

_____

Vorys, Sater, Seymour & Pease, L.L.P., Nicholas M.J. Ray, Steven L. Smiseck, and Lauren M. Johnson, for appellant.

Rich & Gillis Law Group, L.L.C., and Kelley A. Gorry, for appellees Madison County Auditor and Madison County Board of Revision.

Scott, Scriven & Wahoff, L.L.P., Jennifer Stiff Tomlin, James K. Stucko Jr., and Derek L. Haggerty, for appellee West Jefferson Local School District Board of Education.

_____